[No. S043187. July 10, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
BILLY RAY RIGGS, Defendant and Appellant.

252

COUNSEL

David S. Adams, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Kyle Niki Shaffer and Kevin Vienna, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—A jury convicted defendant Billy Ray Riggs of the first degree murder of Jamie Bowie and of robbing her and unlawfully taking her

vehicle. (Pen. Code, §§ 187, 211; Veh. Code, § 10851.)[1] It found true sentencing enhancements as to each count that defendant personally used a firearm (§ 12022.5) and that a principal was armed (§ 12022, subd. (d)) and, as to the murder, the special circumstance that defendant committed the murder in the course of robbing the victim (§ 190.2, subd. (a)(17)(A)). After a penalty trial, the jury returned a verdict of death. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death and to a determinate term, stayed, on the noncapital offenses. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. *Introduction*

On Monday, April 16, 1990, 24-year-old Jamie Bowie left Phoenix, Arizona, in her Volkswagen Beetle to return to Los Angeles, where she was to begin a new job the next day. She never arrived in Los Angeles or spoke with her family or friends again. Several motorists who were driving on Interstate Highway 10 that day later reported seeing Bowie traveling west on the highway, and some said it appeared she was having car trouble and was being assisted by an African-American couple, who were also driving a Volkswagen Beetle. On May 12, 1990, a worker in an orchard in Indio found Jamie Bowie's decomposed body in a ditch. She had been shot twice with a shotgun.

Over one year later, on August 28, 1991, police in Fresno recovered Bowie's Volkswagen, which had recently been abandoned. They were able to determine that defendant had sold the car to a local car mechanic on April 18, 1990, two days after Bowie was last seen alive. On January 10, 1992, the television show *America's Most Wanted* broadcast a segment devoted to the Bowie case, which included descriptions and photographs of defendant and his common law wife, Hilda Riggs, who were wanted for questioning in the murder. Following tips from viewers of the show, the police arrived at the Riggses' apartment in the Los Angeles area shortly after they had fled. One week later, police followed up on further tips that led to the Riggses' new apartment in Los Angeles and arrested them. The Riggses were charged with Bowie's murder and robbery. Hilda Riggs pleaded guilty to first degree murder without special circumstances and agreed to testify against defendant. Defendant, who chose to represent himself, went to trial. The jury deliberated for less than one full court day before convicting defendant of all charges, and again for less than one full court day before returning a verdict of death.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

B. *Guilt Phase*

1. *Prosecution Evidence*

Jamie Bowie was born and raised in Oklahoma and received a bachelor's degree in journalism and public relations from the University of Oklahoma in 1989. In October 1989, she purchased a blue 1978 Volkswagen Beetle convertible. Two months later, she moved to Los Angeles to pursue a career in the film industry. Although she had moved away from home, she remained close to her mother, Diana, in Oklahoma, and a college friend, Victoria Boucher, who lived in Houston, Texas. She talked with each of them on the telephone several times each week.

Bowie eventually accepted a job offer that was to begin on Tuesday, April 17, 1990. For the weekend preceding the start of her new job, which was Easter weekend, she arranged to visit with Boucher in Phoenix, Arizona. On Saturday, April 14, during the drive to Phoenix from Los Angeles, Bowie's car had engine trouble. She was able to make it to Phoenix and took the car to a repair shop to be fixed while she visited with Boucher and Boucher's grandparents, at whose house Bowie was staying. Because of the Easter holiday, the car would not be ready until Monday, delaying Bowie's planned return to Los Angeles by one day. On Monday morning, April 16, 1990, Boucher's grandfather drove Bowie to the repair shop where Bowie picked up her car and then left.

Bowie's brother, Bryan, who also lived in Los Angeles, spent Monday night at Bowie's apartment to await her return. He remembered hearing someone come into the apartment that night using keys. He assumed it was his sister and fell back to sleep. The next morning, he left the apartment and noticed that no one was there and that the front door was unlocked, despite the fact that he had locked it the night before. Later that morning, Bryan learned from his mother that Bowie had not called to say that she had arrived back in Los Angeles. Bryan returned to the apartment around noon and found that the apartment had been burglarized. There was no sign of forced entry. Clothes were strewn about the apartment, and the two televisions were sitting on the staircase with the cords wrapped around them. Several electronic items, including a radio, two video cassette recorders (VCR's), and a telephone answering machine, were missing.

The next day, concerned that Bowie still had not arrived in Los Angeles or contacted anyone, Bowie's family began searching for her along Interstate 10, the main highway between Phoenix and Los Angeles. Bryan and Bowie's father traveled east from Los Angeles and Bowie's mother traveled west from Phoenix. They stopped at gas stations, truck stops and restaurants along the

highway. Several people they talked with remembered seeing—and testified at trial concerning—a young blonde woman fitting Bowie's description traveling west on Interstate 10 on April 16 in a blue Volkswagen Beetle convertible. Some of these witnesses noticed that the woman appeared to be having car trouble and was being assisted or followed by an African-American couple in a red-colored, hardtop Volkswagen Beetle. At trial, James Edwards testified he recognized Hilda Riggs as the female member of the couple helping Bowie, and he was "at least 80 percent" sure the man was defendant. After some initial uncertainty,[2] Gail Horton also identified defendant at trial as the man who was helping the blonde woman.

Despite the Bowie family's continued efforts to find her, there were no further developments in the case until, on May 12, 1990, a worker in a citrus grove near Indio found a body. The body was lying facedown in a ditch next to a dirt road running through the orchard and was severely decomposed and desiccated. A green, 12-gauge, double-ought buck shotgun shell was found three to four feet from the body.

An examination of dental records confirmed the body was that of Jamie Bowie. An autopsy revealed that Bowie had been shot twice with a shotgun, once in the middle of the back and once in the right arm. Bowie's right hand, in fact, was severed from her arm. Either of these wounds could have been fatal. Bowie's lower jaw also was fractured in three places, likely due to blunt force trauma, such as a blow or several blows from a fist or the butt of a shotgun. It was not likely that a fall caused the broken jaw.

The lead investigator assigned to the case, Riverside County Sheriff's Investigator Salvador Pina, testified that in his opinion, Bowie was shot first with buckshot ammunition, which consisted of several large pellets, while the second round was birdshot, which consisted of more numerous and smaller pellets. Pina found birdshot pellets embedded approximately two inches in the ground underneath where Bowie's body was lying, indicating that Bowie was shot with birdshot while lying on the ground. The birdshot pellets found in the ground were inadvertently discarded before trial, however.

There were no further leads in the case until over one year later, when police in Fresno examined an abandoned Volkswagen Beetle and discovered that the confidential vehicle identification number (VIN) on the car matched the VIN of Bowie's missing car. Investigator Pina traveled to Fresno and learned that a local Volkswagen mechanic, Ronald Johnson, and his father,

---

[2] When asked whether she recognized anyone in court, Horton first pointed to defendant's advisory counsel, who was also an African-American male. On redirect examination, she identified defendant, when not wearing his glasses, as the man she had seen on the highway, based on his height, build, and stance.

James Johnson, had purchased the car from defendant on April 18, 1990, two days after Bowie went missing, at an Economy Inn in Fresno. Both men identified defendant at trial as the person who sold them the car. A registration card for that date at the motel had defendant's name and driver's license number, written in defendant's handwriting.

Ronald Johnson testified that when defendant sold him Bowie's car, it had Texas license plates, and the Texas registration and title were in defendant's name. Johnson compared defendant's driver's license and the VIN on the dashboard of the car to the information contained in the title and registration documents and found that they matched. Defendant told Johnson not to sell the car, but he nonetheless sold it to Veronica Galvan about three months later. When Galvan registered the car in California, the smog certificate and the California title and registration for the car had the VIN of a Volkswagen registered to defendant in Texas. This VIN was for a 1973 Volkswagen, not a 1978. The car was later stolen from Galvan and then abandoned before the Fresno police discovered it. At some point the car was repainted a dark color, although the witnesses identified some areas of the car that still had the blue paint visible. The recovered car also had the same tear in the convertible top that was present when the Johnsons purchased the car from defendant. It was not entirely clear whether, when the police recovered the car, both the public VIN and the confidential VIN matched the original VIN of Bowie's Volkswagen, or only the confidential VIN matched.[3]

Testimony at trial established that Bowie's automated teller machine (ATM) card was used three times between 9:46 and 9:49 a.m. on April 17, 1990, in Granada Hills, near Los Angeles. The attempted ATM withdrawals of, successively, $200, $100, and $20 were rejected because there was only $7.67 in the account. Bowie's father testified that he called his daughter's apartment at approximately 9:00 a.m. on April 17 and left a message on the answering machine. When he called back between 11:00 a.m. and noon that day, the phone rang and the answering machine did not answer.

Reynaldo Quintana testified that he purchased a VCR and some jewelry from defendant in Denver, Colorado, in August or September of 1990. Robin Bell, from whom Bowie was subletting her apartment, testified that the VCR Quintana bought from defendant was the same brand and had the same distinctive modification as a VCR belonging to Bell that had been stolen from the apartment. Bryan Bowie also identified the VCR as looking like one stolen from the apartment. A distinctive suitcase that Bowie's mother and

---

[3] John Smith, the Fresno police officer who examined the car, testified that both VIN's were the same, while Investigator Pina testified that the public VIN, normally located on the dashboard of the car, had been removed. At the time of trial the car was not available because it had been released to Bowie's insurance company.

brother testified looked like one belonging to Bowie was found at the house of Claudia Grant, Hilda Riggs's mother. The suitcase had a small lock on it that was the same brand as the one Bowie's mother had given to Bowie, and unlocked with a key Bowie's mother had with her in court. Grant testified that Hilda Riggs and defendant gave Grant the suitcase when they dropped off defendant's grandson one or two weeks before they were arrested in this case.

Hilda Riggs (hereinafter Hilda) testified for the prosecution. Hilda and defendant were traveling from Arizona to Los Angeles when they saw Bowie and her Volkswagen at a gas station in Arizona. Defendant, who was a Volkswagen mechanic, helped Bowie fix her car, and defendant and Hilda subsequently followed Bowie westbound on Interstate 10 through the remainder of Arizona and into California. Along the way, defendant repaired Bowie's car approximately 10 more times. Defendant told Hilda that he was helping Bowie so he could "get a new customer," in that he planned to help her buy and install a new motor for the car. At some point after it got dark, however, defendant said he was tired of helping Bowie and had instead decided to rob her because he thought Bowie "had dope." He also told Hilda that he would have to kill Bowie because she had seen his face; defendant was on the run from police in Texas.

Bowie, defendant, and Hilda stopped for dinner at a restaurant in Banning, California. After dinner, defendant told Bowie and Hilda to get into Bowie's car while he checked the engine. Defendant then approached Bowie with a handgun, a weapon that Hilda testified was not functional, and ordered Bowie to get in the backseat of the car and told Hilda to retrieve a shotgun from defendant's car. When Hilda returned with the shotgun, defendant and Bowie were in the backseat. Defendant took the shotgun and told Hilda to drive the car back to the freeway and go back east toward Indio. On the way, defendant asked Bowie for the code for her ATM card, which Bowie gave, but she also said there was no money in the account. Before they got to Indio, they exited the freeway and attempted to withdraw money from an ATM, but were unsuccessful.

Defendant then told Hilda to drive past the freeway and follow a dirt road. Defendant eventually ordered Hilda to stop the car, at which point he and Bowie got out, and then he told her to turn the car around. While defendant was gone, Hilda heard a shotgun blast. A few minutes after leaving the car, defendant returned by himself. He got in and told Hilda to drive away but, after a few feet, told her to stop again. He then got back out of the car, and Hilda heard a second shotgun blast. Defendant returned to the car and told her to drive back to the restaurant in Banning. Hilda and defendant then picked up defendant's car at the restaurant and drove both cars to Los Angeles.

Hilda testified that she and defendant drove directly to Bowie's apartment in Van Nuys, stopping only for gas, and arrived there the same night. Defendant took Bowie's keys and went to the apartment but returned soon thereafter and told Hilda he could not enter because there was a chain on the door. The next morning, they unsuccessfully attempted to use Bowie's ATM card and then returned to the apartment. This time, defendant came back to the car with two suitcases, a radio, two VCR's, a telephone and answering machine, and a jewelry box and jewelry. Hilda identified the suitcase found at her mother's house as one defendant had taken from the apartment.

Defendant and Hilda then drove the two cars to a motel in Fresno. Hilda identified at trial a photograph of a motel room as being of the room in which they had stayed. In Fresno, at defendant's request, Hilda called a Volkswagen repair shop to inquire about selling Bowie's car. She identified a photograph of Ronald Johnson's shop as the one she contacted where someone was interested in buying the car. Defendant replaced the license plates from Bowie's car and the VIN on her dashboard with the license plates and VIN from his own car and then sold Bowie's car at the motel to the "young guy" from the shop.[4]

Hilda testified that she and defendant then traveled to Denver, Colorado, where they stayed for three to five months. While there, defendant sold a VCR and some of Bowie's belongings to the owner of a pawnshop. They went next to Phoenix, Arizona, and stayed there approximately six months. Hilda returned to Los Angeles when defendant was incarcerated in Phoenix on a matter unrelated to the Bowie murder. After three months, defendant rejoined Hilda in Los Angeles.

Based on a listing in TV Guide, defendant told Hilda to record an *America's Most Wanted* television program about the Bowie murder. When defendant watched the program and saw his and Hilda's photographs, defendant said, "We caught." Defendant and Hilda fled the apartment and went to her mother's house, leaving their uneaten dinner on the table. Defendant told Hilda that if they were caught, she should tell the police they helped Bowie during the day but never saw her again after it became dark.

When they were arrested a week later, Hilda initially told the police this exculpatory version of events, but she testified that she told the truth to the investigating officer later the same day. Hilda pleaded guilty to first degree murder and received a sentence of 25 years to life in prison, and had already been sentenced when she testified at defendant's trial.

---

[4] James Johnson also identified the photograph as being of the motel room where defendant arranged the sale of Bowie's car.

In response to the prosecutor's question why Hilda did nothing to stop Bowie's murder, Hilda testified that she was afraid defendant would kill her as well. Defendant had threatened to kill Hilda on the Friday before the murder when Hilda said she was leaving him. Hilda testified that during the year after the murder, she once called the police to report the crime but was told she had to come into the station to make the report. Defendant offered to drive her to the station but instead took her around the corner and beat her with a bat, then made her take off her clothes and drove her to the desert. Hilda testified that she chose to testify against defendant because he should "pay for what he did."

On cross-examination, in response to defendant's question concerning how defendant treated Hilda when they were living in Los Angeles, Hilda answered that defendant beat her, as he had done the previous eight years. Hilda then testified, in response to further questions by defendant, that she told people her injuries from the beatings were the results of accidents, except for a cousin to whom she told the truth. Hilda testified she had no choice but to stay with defendant because he threatened to kill her father if she left. Defendant made this threat "every time" he beat her. The threats of harm to Hilda and her father were also the reasons why Hilda did not attempt to leave the scene of the crime while defendant was outside of the car. Hilda was pregnant with defendant's child when they were arrested.

The prosecution called Dr. Geraldine Stahly, a social psychologist who specialized in the study of domestic violence. Dr. Stahly testified concerning the psychological characteristics of "battered woman syndrome" (BWS) that might lead a woman in a physically and mentally abusive relationship to follow the demands of her abuser and not try to end the relationship. Based on a hypothetical question paralleling the facts of this case regarding Hilda's assistance in the murder and failure to report the crime while a fugitive, Dr. Stahly testified that such circumstances "describe[d] almost precisely . . . battered woman accommodation syndrome . . . in which a woman who has been a chronic victim of abuse does things which are both inconsistent with her own history of behavior and which are criminal acts under the direction and under the fear and threat of the person who's been her batterer. [¶] Typically, in these situations, the woman believes that if she doesn't do exactly what she's told, that she will be killed. In some cases the woman reports that—that even though she'd be willing, she doesn't care if she dies, she's tired of living, she's sure that even killing her wouldn't be enough, he would kill other people that she loved. . . ."

Dr. Stahly also testified that people subjected to severe stress and trauma may develop a "flat affect," appearing unemotional, even when recounting traumatic events. Further, once a battered woman is removed from the

abusive relationship, she may want to cooperate with the authorities to ensure that her abuser is punished and unable to abuse others.

Los Angeles Police Officer Eugene Edwards testified that when defendant was being transported to jail after his arrest, he told the officers he had been trying to arrange for travel to a country that would not extradite him. Later, defendant said he heard Hilda giving her statement to the officers, and he told them he would take the blame for the murder because Hilda was carrying his baby.

On January 27, 1992, defendant sent a note to a sergeant at the jail stating that he wanted to discuss the case with Investigator Pina. Defendant waived his *Miranda*[5] rights and made a tape-recorded statement, which was played for the jury. Defendant said that he had watched an episode of *America's Most Wanted*, which reported that defendant and Hilda had been captured and in which Hilda gave an account of the murder consistent with her later trial testimony. Defendant told Pina that he wanted to give a statement to correct two inaccuracies in the program: (1) that Hilda was not 14 years old when defendant met her, and (2) that Hilda—not defendant—shot Bowie. Defendant said a friend named Clayborn Roberts had, prior to the murder, told him that Bowie was a drug courier and was transporting drugs from Phoenix to Los Angeles. Defendant planned to rob Bowie of the drugs and in fact had driven from Los Angeles to Phoenix, had waited at the Volkswagen repair shop for Bowie to arrive, and then followed her as she headed back to Los Angeles.

According to defendant, after kidnapping Bowie at the restaurant in Banning and driving her to the orchard in Indio, defendant gave Hilda the shotgun to guard Bowie while defendant searched the car for drugs. Hilda, however, was jealous of how Bowie and defendant had behaved during the day and ended up shooting Bowie. Defendant admitted stealing items from Bowie's apartment and selling her car in Fresno.

On February 18, 1992, defendant again asked to meet with Investigator Pina to discuss the case and gave a second tape-recorded statement, which also was played for the jury. Defendant again stated that he and Hilda "did this crime together," intending to rob Bowie of drugs, but that Hilda shot Bowie out of jealousy. Defendant described how Bowie's body spun around when she was shot and ended up in a gully. When defendant took the shotgun from Hilda and looked down into the ditch, he heard Bowie say, "I'm already dead." Defendant denied that Bowie had been beaten before she was shot. Defendant acknowledged that he was partly responsible but said he did not

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

"want to take punishment for somethin[g] that somebody else did." He also mentioned he was writing a book and was including "everything that [he could] think of."

Jail personnel later seized a handwritten manuscript of a book defendant was attempting to send to a publisher. The manuscript was an autobiography and gave an account of the murder along the lines of what defendant had said to the police, although it recounted that when defendant was contemplating abandoning the plan to rob Bowie, Hilda encouraged him to stick to the plan, and also that Hilda mentioned to defendant her jealousy and thoughts about shooting Bowie before they ate dinner in Banning.

### 2. Defense Evidence

Defendant presented an alibi defense. Ina Ross, defendant's sister, and Minnie Hill, his niece, testified that defendant, Hilda Riggs, and Hilda's son (defendant's grandson) Dejawhn Riggs, Jr.,[6] were in Stockton during the day of April 16, 1990, and did not leave Stockton until around 7:00 or 8:00 p.m. Hill's diary for the month of April of 1990 included an undated notation about visiting with defendant.

Aaron Crain and Chester Eddy were working at a gas station in Blythe, California, on April 16, 1990. Crain testified that he saw a blue Volkswagen Beetle convertible driven by a white female come into the gas station. A faded orange-colored Volkswagen also pulled into the station, and an African-American man who was driving the orange car met with the woman from the blue car and then told Crain that her car's engine was leaking oil and needed to be repaired. There was a second man and a woman who stayed in the orange car. On cross-examination, Crain identified defendant as the second male who remained in the orange Beetle. After oil was added to the convertible, the two cars left, heading westbound towards the interstate. Chester Eddy testified he was inside the garage at the station and saw a young blonde woman and an African-American man at the station. Both of them were driving Volkswagens. Eddy had seen defendant on possibly two or three occasions a number of years prior to April 16, 1990; he did not see defendant at the gas station on that date, but did not look at the second Beetle except for less than one second as it drove by the door of the garage.

Bessie Hodges testified that she saw someone who may have been Jamie Bowie alive in Blythe after April 16, 1990.

Several witnesses testified about the VIN's for Volkswagen cars, what the numbers meant, and where and how the VIN's were placed on the vehicle.

---

[6] Dejawhn, Jr., was the child of Hilda and defendant's son. Hilda was separated from defendant's son when she met defendant.

Nancy Ortner, a defense investigator, testified and demonstrated in court that two locks manufactured by the Lark company opened with the same keys. A key Ortner brought to court opened the lock on Jamie Bowie's suitcase, and the key provided by Diana Bowie opened a lock Ortner brought to court.

### 3. *Prosecution Rebuttal Evidence*

Martin Gonzalez, an employee of the California Department of Motor Vehicles (DMV), testified that on July 10, 1990, he inspected a blue Volkswagen Beetle convertible that a young Hispanic woman had purchased and was attempting to register. Gonzalez discovered that the public and confidential VIN's for the car did not match, and completed a form referring the car to the California Highway Patrol theft unit for inspection. Debra Gonzalez, who was also a DMV employee, testified that she mistakenly issued a registration for the blue convertible without its first having been inspected by the highway patrol.

Dejawhn Riggs, Jr., Hilda Riggs's son and defendant's grandson, testified that he had been to Stockton only once and had never been there at Easter.

### C. *Penalty Phase*

#### 1. *Prosecution Evidence*

The penalty phase case in aggravation consisted primarily of the circumstances of the murder of Jamie Bowie and defendant's extensive history of violence, as recounted by defendant's ex-wives, girlfriends, and family members. The prosecution also presented evidence of defendant's two burglary convictions and of the effect Bowie's murder had on her family and friends.

##### a. *Cecelia G.*

In the spring of 1965, when Cecelia G. was 15 years old, she met and began dating defendant, who at the time was 21 or 22 years old. During an argument between the two, Cecelia said she was leaving, and defendant pointed a handgun at Cecelia's head and pulled the trigger, though the gun did not fire because there was no round in the chamber. Cecelia thought she was going to be killed when defendant pulled the trigger. Cecelia did not see defendant again until several months later when he met her after school and kidnapped her at gunpoint. Defendant, who was accompanied by two other males, took Cecelia to his apartment, where she was raped and beaten by defendant and the other two men. This lasted through the night and part of the next day. Cecelia's parents reported the incident to the police, and

defendant was charged with forcible rape and, after fleeing the jurisdiction for a number of years, was ultimately convicted in 1980 of unlawful sexual intercourse with a minor.

### b. *Abuse of Wives, Girlfriends, and Dejawhn Riggs, Jr.*

In January 1964, when Gene R. was 16 years old and attending high school, defendant forcibly raped her in a car. As a result, Gene became pregnant and because of the pregnancy, married defendant rather than have an abortion. After they were married, defendant continued to force Gene to have sexual intercourse against her will. If she refused, defendant hit her. On one occasion, defendant hit Gene in the mouth with a telephone receiver because he did not like the conversation she was having. When Gene went to the bathroom to wash off the blood from her injury, defendant followed her and eventually pushed her head down into the sink. During an argument, defendant placed a pillow over Gene's face and held it there, which disrupted her breathing. Defendant prevented Gene from seeing her sister for three months. Gene separated from defendant in the spring of 1965.

Lena Swindle met defendant in 1966 when she was a senior in high school, and was married to him from 1970 through 1978. Defendant often hit her with his fists in her chest, sometimes striking her hard enough to make her fall. He hit her in her chest, rather than her face, so that no one could see her injuries. On one occasion defendant attempted to hit Swindle while he was driving a car, and she jumped out of the moving vehicle to avoid being struck. Defendant dragged her back to the car while she was screaming for help and then continued driving. Defendant caused problems with Swindle's family, and she therefore had little contact with them while she was married to defendant, despite their otherwise being very close.

Sandra Riggs testified that she and defendant were together for approximately one to two years, were married in 1982, and later separated but never divorced. Defendant hit Sandra three or four times with his hands, once giving her a black eye, and also once kicked her in the stomach. Defendant once forced Sandra to make a recorded statement that she was a lesbian by twisting an electrical cord around his hands in a way that made her think he might strangle her to death. She did not leave defendant, despite the physical abuse, because she was afraid he would find her and hurt or kill her.

Vicci L. testified that she lived with defendant for a period of time in 1982 or 1983. Defendant hit her fewer than 10 times while they were together, once giving her a black eye. He once hit her in the face and broke the eyeglasses she was wearing. On another occasion he hit Vicci in the head with a gun. When defendant put down the gun, Vicci took it and shot at

defendant, who then jumped on her and knocked her to the floor, dislocating her shoulder. He then put the gun in her mouth and threatened to kill her. Vicci testified that defendant, against Vicci's will, once tried to push a bottle into her vagina and "maybe once" forced her to have sexual intercourse when she did not want to. Defendant prevented Vicci from talking with her friends and family while they were together.

Hilda Riggs testified that during their relationship, defendant hit her numerous times with a baseball bat, a barbell, a pipe, a rifle, and the shotgun used in the Bowie murder. She had bruises all over her body, including bruised ribs and at least 50 black eyes, during the seven years they were together. Defendant also once dislocated her jaw by hitting her with a bat. He physically abused Hilda's son Dejawhn, Jr., when he was between four and seven years old. Hilda did not leave because she was afraid defendant would kill her father.

### c. *Killing of Defendant's Brother*

Lena Swindle testified that in 1972, she was with defendant and their two children at defendant's mother's home in Los Angeles. Also present were defendant's mother and his three brothers, Rickie, Larry and Dejawhn. Defendant and his mother were arguing in the kitchen, and she asked Rickie to intervene. Defendant and Rickie exchanged heated words, and defendant then left the kitchen momentarily, returning with a handgun. Defendant pointed the gun at Rickie and told him he should not say anything more or else defendant would kill him. Rickie, who was unarmed, told defendant "he better do it or [Rickie] would kill him." Defendant then shot Rickie in the chest.

After the shooting, defendant did not rush to aid his fallen brother but instead told Swindle to collect their children and get in their car. They left his mother's home and drove first to San Francisco and then to Florida.

Defendant told Vicci L. that the killing was an accident. Defendant said he was cleaning a gun and it accidentally went off.[7]

### d. *Burglary Convictions*

In 1983, defendant was convicted of burglary of a commercial building and burglary of a residence in Texas, for which he received concurrent sentences of 10 years' imprisonment. Sheriff Paul Ross, who investigated the commercial burglary, notified the Texas parole board that defendant was a "good

---

[7] Defendant later testified that criminal charges were filed against him as a result of the shooting, but were dismissed after a preliminary hearing.

prisoner and that [Ross] had no problem with him being released" early on parole because, after talking with defendant, Ross believed defendant's claim that he had found religion and had been rehabilitated.

### e. *Victim Impact Testimony*

Jamie Bowie's mother testified concerning Jamie's life and the impact Jamie's disappearance and death had on her and on Jamie's family.

## 2. *Defense Evidence*

### a. *Family Members' Testimony*

The defense presented evidence that when defendant was a child, his parents separated and his mother moved with the children to California. Defendant's father, Edward Riggs (whom Lillian Tucker, defendant's aunt, testified was a "lovely" father), died of an illness shortly thereafter. Defendant had difficulty getting over his father's death. According to Tucker, defendant's mother once whipped defendant with an electrical cord. She also made him work in her building-maintenance business at night after defendant attended school during the day. When defendant's mother remarried, her new husband was mean to defendant and his brothers.

Lanny Henry, defendant's cousin, testified that although defendant's mother did not physically abuse him, she may have mentally abused him. Henry was aware of defendant's criminal activities and believed they were a result of his family background in that defendant's mother did not discipline him when he behaved badly, but instead made excuses for his behavior. Having to work in his mother's maintenance business until the early morning hours meant that defendant did not attend school and got "off track." In Henry's experience, defendant was not physically abusive to women or children but in fact discouraged such actions. Henry would be devastated if defendant were executed and believed defendant could be of benefit to society in prison as a positive influence on other inmates.

Defendant's sister, Pearlie Thomas, testified that she had never seen defendant act violently, use drugs, drink alcohol, smoke, or curse. It was her impression that defendant and Hilda Riggs were happily married; she saw no signs of physical abuse or unhappiness between them. She stated she would be devastated and defendant's family would be hurt if defendant were to be executed.

Several other family members and acquaintances testified that they observed no signs of defendant's having abused Hilda, Lena, or Dejawhn, Jr., or

other women, or otherwise having engaged in criminal activities. Most of the witnesses testified that defendant's relationships with women appeared to be loving. Some witnesses testified that defendant had been a positive influence in their lives in terms of offering guidance and advice and that in their opinion defendant should not be executed.

### b. *Psychologists' Testimony*

Dr. William Jones, a licensed psychologist, testified that he met with defendant on two occasions: once in 1992 to perform a competency evaluation, and once in 1994 to perform a complete psychological evaluation. Dr. Jones opined that defendant was competent, of normal intelligence, and had good communication skills. Defendant was not psychotic, but appeared to be impulsive and immature to some degree, and had poor judgment, especially when under stress. Dr. Jones testified that in his opinion defendant was very self-centered, in the sense that he paid attention only to his own thoughts and opinions, and "present-centered," in the sense that he concentrated on his present actions or statements without regard to their consistency with his past actions or statements or their consequences on his future. Defendant also had a grandiose view of his own intelligence and abilities. Dr. Jones observed that defendant appeared to have an unusually low level of anxiety, given his situation. Dr. Jones believed the psychological tests showed defendant had some resentment and sense of inferiority toward women, though the tests did not necessarily indicate defendant was abusive to women. Defendant also displayed "weaknesses in sequential abilities," meaning he had some difficulty placing thoughts and ideas in their proper, logical order.

Another licensed psychologist, Dr. Michael Leitman, also performed psychological testing on defendant and reported conclusions similar to those of Dr. Jones. Dr. Leitman found that defendant had a very complicated personality. Defendant contradicted himself and "miss[ed] relevant cues," which caused him to act in ways he thought were correct, but which other people would view as wrong. In Dr. Leitman's opinion, defendant had difficulty handling stress and would keep people at a distance in order to prevent them from learning of defendant's self-perceived weaknesses and insecurities. Defendant did not exhibit violent tendencies, though he might become angry if other people viewed his actions as wrong when defendant thought he was "being the good guy."

Dr. Halford Fairchild, a social psychologist and professor of psychology specializing in African-American psychology, testified concerning his theory of "probabilistic environmentalism," which he described as the view that a person's social and physical environments affect the probability that the person will follow a particular course in his or her life. According to

Dr. Fairchild, some African-Americans have a feeling of alienation, in the sense of being detached from society and the dominant culture, and self-hatred and a devalued sense of self-worth, which may manifest itself in the form of violence against others.

### c. Jail Witnesses' Testimony

Ten inmates who knew defendant in the Indio Jail testified as to defendant's good character, his efforts to assist other inmates with legal matters, and his participation in religious studies and activities. One inmate, Anthony Peoples, also testified that Hilda Riggs told him she had committed the murder, although a note Peoples sent to defendant (in which he offered to testify) stated that Hilda said she "didn't it [sic]." Another inmate, Donovan Dumas, testified that Hilda made disparaging comments about defendant while in the jail.

Several law enforcement and correctional officers who worked at the jail testified that defendant was generally courteous to the staff and friendly with the inmates, although he had been in some fights with other inmates. Defendant assisted in keeping the jail's law library organized and functioning.

### d. Defendant's Testimony

Under examination by advisory counsel, defendant testified that his father was loving and caring but his mother was abusive to defendant and his brothers. When defendant's father was seriously injured at work, defendant's mother left him and took the children to Los Angeles. She engaged in prostitution there and neglected and physically abused the children. After defendant's father died, his mother remarried three times; her first husband hated children and called defendant a "halfbreed dog." Defendant's mother and stepfather ran a janitorial business and forced defendant and his brothers to work at night after school. Despite this, defendant testified he did well in school academically and athletically. Nonetheless, defendant did drop out of high school and did not receive a general equivalency degree until seven years later.

When he turned 20 years old, defendant began searching for employment, but was unable to find a job. A friend suggested that defendant help him steal a car, and defendant agreed to assist. Defendant then became involved in a car theft ring and other crimes, such as drug dealing. For a time defendant was successful running a Volkswagen repair business in Dallas, but Hilda sabotaged the business. Defendant said he sold the business because he did not want to "do something real drastic" to her. Defendant felt that the neglect and abuse inflicted on him by his mother and stepfathers caused him to

become greedy and desire material possessions, which led him to engage in criminal activities when he did not have legal employment.

Defendant denied that he had ever physically abused any of his wives or girlfriends. He stated he, in fact, treated the women "like queens." He admitted that he had struck his grandson with a belt on three occasions to discipline him, but denied he had engaged in any other physical abuse. Defendant also testified concerning his religious convictions and ability to provide guidance and advice to other inmates. He also claimed he had been productive and obedient while he was incarcerated.

Defendant testified that he shot his brother Rickie in self-defense. According to defendant, Rickie was armed with a pistol and blocking the front door of the house to prevent defendant and his family from leaving. Sometime during the argument, Rickie raised his gun and pointed it at defendant, at which point defendant shot him. Defendant told others his brother had been shot accidentally while the gun was being cleaned because that was what defendant's mother had told him to say.

On direct examination, defendant denied any involvement in Jamie Bowie's murder. On cross-examination, defendant testified that he did not know how Bowie was killed. According to defendant, Hilda was with a man named Robert Beverly, who matched the description of the African-American man whom Aaron Crain and Chester Eddy testified they saw at the gas station in Blythe on April 16, 1990. Defendant testified that Beverly, who was serving in the Navy, was involved in defendant's drug distribution activities as a guard for the drug shipments. Defendant first met Beverly in 1986 in Dallas, Texas, and contacted him again in California in 1989 to ask him to assist in the drug conspiracy. According to defendant, he last saw Beverly in Fresno on April 15, 1990, when they met to discuss the drug business while defendant and Hilda were on their way to see his sister in Stockton.

Defendant testified that on April 15, 1990, he visited with his sister and later drove to the Sizzler's restaurant in Banning and met Hilda. Hilda took defendant to the orchard and showed him the body of a young lady. When confronted with the fact that Jamie Bowie did not leave Phoenix until April 16, defendant professed not to be positive of the dates. Defendant admitted to burglarizing Bowie's apartment, and testified that he gave the Johnsons Bowie's Volkswagen and sold them defendant's own Volkswagen with the understanding that the Johnsons would "cut up" Bowie's car.

Defendant testified that he and Hilda had planned to accuse each other of shooting Bowie, although he acknowledged that he was aware of aider and abettor law, and that they would, in essence, be "pointing the fingers at

[them]selves." He could not explain the intended purpose of accusing each other, other than it might in some way help Hilda. Defendant explained that he did not accuse Beverly of being involved when he spoke to police, nor did he call Beverly as a witness at trial, because Beverly could not be found.

Finally, defendant testified that he and Jamie Bowie were romantically involved before her murder. According to defendant, Bowie met him at the weightlifting area of Venice Beach in Los Angeles in January 1990. After meeting at the beach two more times, defendant and Bowie went to a hotel near the airport, where defendant registered under a false name. Defendant and Bowie met several more times in motels. On one occasion defendant and Bowie went to a motel and spent the entire night and next day there. In February, Bowie went to Texas for two weeks, and when she returned defendant met her once at her apartment. In all, defendant and Bowie met 10 or 11 times. No one knew about their relationship because they kept it secret.

### 3. *Prosecution Rebuttal Evidence*

In rebuttal to defendant's assertion that Robert Beverly was involved in Bowie's murder, the prosecution called Beverly as a witness. Beverly was a top-secret communications specialist with the Navy in 1990, stationed at Point Mugu Naval Air Station in Camarillo, California. Beverly testified that he had never met defendant, Hilda Riggs, or Jamie Bowie, and had never been to Dallas, Texas, where defendant claimed to have met him. The only time Beverly had driven to and from Phoenix, Arizona, on Interstate 10 was in mid-March 1990, and he received a speeding ticket in Banning on March 15th on the way to Phoenix. Beverly was not involved in a drug conspiracy with defendant or the murder of Jamie Bowie. According to Beverly, his actions—even when not on duty—were constantly and surreptitiously monitored by the Navy in 1990 because of his top-secret security clearance, and he would have been "taken in" had he been involved in criminal activities.

Clayborn Roberts, who—according to defendant's statements to the police—had provided the information that Bowie was delivering drugs from Phoenix to Los Angeles, testified that he did not know Jamie Bowie and never talked to defendant about her or anyone else transporting drugs from Phoenix to Los Angeles. A few days before Thanksgiving in 1991, Roberts visited defendant at defendant's home in Phoenix, and defendant showed him a pistol-grip, 12-gauge, pump-action shotgun and told Roberts something along the lines of "this is the one I shot the broad with."

Aaron Crain was recalled to rebut defendant's testimony that defendant was not at the gas station in Blythe on April 16, 1990, at the same time as the young blonde woman with the blue Volkswagen convertible. Crain confirmed that he was sure that he saw defendant there.

The prosecution also called several witnesses to rebut defendant's testimony that he had a romantic relationship with Bowie. Bowie's friend Victoria Boucher testified that Bowie had "strong morals," rarely dated, and had "longer term" relationships when she did date. Bowie did not have a reputation for "fooling around or messing around with different guys," and was dating someone named Jonathan Ward from January 1990 to April 1990. Bryan Bowie, Jamie's brother, testified that when he and Jamie shared an apartment in January and the first two weeks of February of 1990, Jamie never spent a night away from home. Bryan and Jamie often rented movies to watch at the apartment or went to the theater together to watch movies on the weekends and continued to do so when Jamie moved to her own apartment. Jamie did not go to Texas after she moved to Los Angeles. Bryan had never seen or heard of defendant before this case. In addition, an investigator for the district attorney's office testified that the records of the Hyatt hotel defendant had identified in his trial testimony had no registration record for the name defendant testified he used when he went there with Bowie in January 1990.

Dejawhn Riggs, Jr., defendant's grandson, testified that besides hitting him with a belt, defendant once punched him in the stomach, which caused Dejawhn to lose his breath, and once kicked him in the stomach, which caused him pain. On another occasion, defendant fastened Dejawhn's hands above his head to a post with duct tape and hit him with a belt, which left lines on his body, onto which defendant rubbed salt. Dejawhn also saw defendant hit Hilda with his hands.

A deputy sheriff assigned to the Indio Jail testified that he saw defendant fighting with another inmate in the jail. Defendant later told the deputy the fight started because the other inmate was disturbing defendant while he was watching television. Defendant punched the other inmate in the upper body and face three times and bit him on the back.

### 4. Defense Surrebuttal Evidence

An inmate from the jail testified that defendant did not punch or kick the other inmate during the fight in the jail. Robert Beverly testified, consistent with his rebuttal testimony, that he drove to and from Phoenix in March 1990, not in April.

Surila Collins, defendant's aunt, testified that defendant's mother treated defendant unfairly as a child because she left his father and told the children he was not a good husband. Collins never saw evidence that defendant physically abused Dejawhn or Hilda. One of Dejawhn's childhood friends testified that he never saw evidence that defendant abused Dejawhn, either.

Elizabeth Beck, another of defendant's aunts, testified that defendant lived with her when he was a child. Defendant was a good runner in track, got along well in the neighborhood, and did not get in trouble with the law or at school. Defendant treated Dejawhn like a son and did not abuse him. Defendant's mother was not a good influence on her children because her behavior taught the children that there was "only one way and that was her way whether it was right or wrong." Defendant's mother also had relationships with other men while she was married to defendant's father. Beck would feel very disappointed if defendant were sentenced to death and believed defendant could repent and become a better person if sentenced to life in prison.

## II. DISCUSSION

### A. *Assertedly Inadequate* Faretta *Advisement*

Defendant represented himself at the preliminary hearing and throughout the trial.[8] He now claims on appeal that his conviction and sentence should be reversed because he never knowingly and intelligently waived his Sixth Amendment right to the assistance of counsel. Defendant contends that the two colloquies conducted by the municipal and superior court judges concerning the dangers and disadvantages of self-representation were inadequate under the United States Supreme Court's decision in *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*) because the trial court did not mention to him "the factors that are unique to a death penalty case." We are not persuaded.

### 1. *Background*

On January 22, 1992, defendant was arraigned on the charges, and the Riverside County Public Defender's Office was appointed to represent him. Just under seven weeks later, during a pretrial hearing on March 10, 1992, defendant made his first request to represent himself. Resolution of defendant's request was deferred at that time because the trial court—at the request of defendant's attorney—ordered a competency evaluation pursuant to section 1368. After defendant was found to be competent, a preliminary hearing was scheduled for April 21, 1992.

At the start of the scheduled preliminary hearing, defendant's attorney stated that defendant was not ready to proceed because defendant wished to make a motion to relieve counsel and represent himself. Defendant confirmed

---

[8] Advisory counsel was appointed to assist defendant for part of the pretrial proceedings and for the entire trial.

this, stating, "I feel that no one can conduct a better trial than I would for myself. I have just one life to give and I would like to exercise my right to counsel of my choice and I choose myself." The trial court then conducted a lengthy colloquy with defendant concerning his familiarity with the charges, his experiences with the legal system, his educational background, and the disadvantages of self-representation. At one point in the discussion, the prosecutor listed each area of inquiry suggested in *People v. Lopez* (1977) 71 Cal.App.3d 568, 572–574 [138 Cal.Rptr. 36] (*Lopez*), and the trial court further discussed those areas it had not already covered. Throughout the entire colloquy defendant reiterated that he understood the implications of his decision to represent himself and wanted to do so. Indeed, he at one point stated, "I've had three months to think about this, your honor, and it's not a snap decision. I feel it is a rational decision." The trial court ultimately found that there was "no reason at this point to deny [defendant] his right to represent himself. He is clearly intelligent, articulate, appears to understand the difficulty that he's facing representing himself and is willing to shoulder that responsibility at his peril." The trial court granted defendant's motion to represent himself and relieved the public defender.

After the preliminary hearing, at which defendant represented himself, defendant was held to answer in the superior court. At the arraignment on the information on May 21, 1992, the trial court inquired concerning defendant's desire for appointed counsel. Defendant again stated that he did not want counsel appointed to represent him. In response to the trial court's inquiry concerning whether defendant's decision to represent himself merely reflected his desire to choose his own attorney, defendant made clear that he wanted to represent himself:

"[Defendant]: Your honor, I'm very serious about representing myself. I have no doubts about that whatsoever, but I am serious about myself. I know it's my life. I only have one. [¶] . . . [¶]

"The Court: But what I meant to say was . . . you would like to have a lawyer but you don't want the ones you think are available; is that right?

"[Defendant]: No, your honor. That's not right. [¶] I said if I had a second choice besides myself, it would be a lawyer that I would pick. [¶] Other than that, I do want to represent myself, period. [¶] And I'm standing on that. I haven't changed one bit, your honor."[9]

---

[9] It appears there may have been some initial confusion between defendant and the trial court because the trial court initially asked whether defendant had an attorney representing him, to which defendant answered, "Other than myself, no," and the trial court then asked if defendant wanted "a lawyer to assist you in this matter," to which defendant answered "yes."

At this hearing the trial court again discussed at length with defendant the dangers and disadvantages of self-representation, and the prosecutor again mentioned the areas of inquiry set forth in *Lopez, supra,* 71 Cal.App.3d 568. When ultimately asked whether he understood the "pitfalls and dangers of self-representation," defendant responded affirmatively. The trial court found that defendant had waived his right to the assistance of counsel and allowed him to continue to represent himself.

## 2. *Analysis*

On appeal, defendant acknowledges that the record here establishes a knowing, intelligent, and voluntary waiver of the right to counsel "at any other sort of trial." He contends, however, that the advisements in this case were insufficient because in neither colloquy, at the preliminary hearing or at the superior court arraignment, did the trial court explain to defendant the particular "factors that are unique to a death penalty case." Defendant argues the trial court should have advised him (1) that defenses offered in the guilt phase must be carefully considered because they may conflict with potential penalty phase defenses; (2) that there are different burdens of proof in the guilt and penalty phases; (3) that evidence that would not be admissible at the guilt phase might be admissible at a penalty phase; and (4) that if defendant were convicted at the guilt phase, there would be a separate penalty phase of the trial. Defendant contends the failure to do so renders his conviction and sentence unconstitutional. Defendant is mistaken.

■ The United States Supreme Court recognized a criminal defendant's right to self-representation in *Faretta,* but the court stressed that any waiver of the right to counsel must be knowing, intelligent and voluntary: "A defendant seeking self-representation 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." ' " (*People v. Bloom* (1989) 48 Cal.3d 1194, 1224–1225 [259 Cal.Rptr. 669, 774 P.2d 698], quoting *Faretta, supra,* 422 U.S. at p. 835.) As we stated in *Bloom, supra,* 48 Cal.3d at page 1225, however, "[t]he test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case."

The asserted shortcomings in the colloquies in the present case do not undermine the trial court's finding that defendant understood the disadvantages of self-representation, including the risks and complexities of the

Once the trial court made clear that it was referring to counsel representing defendant for the entire trial—not merely to assist during the arraignment—defendant clarified that he wanted to represent himself.

particular case. First, defendant is incorrect in claiming that the record does not establish that he was aware of the fact that if convicted in the guilt phase, he would then face a penalty phase of the trial. To the contrary, when taking defendant's pleas to the charges in the information—before the trial court made its ultimate finding that defendant had waived his right to counsel—the trial court told defendant, "It is also alleged by the District Attorney that a special circumstance [applies] *which if found true would trigger a penalty phase in the trial* in that the homicide in this case was committed during the perpetration of a robbery . . . ." When asked whether he understood that allegation, defendant stated he did. The trial court then again asked defendant whether he understood "if at the jury trial, the jury finds that beyond a reasonable doubt that the homicide occurred during the commission of the robbery, that that would trigger the penalty phase in which the possible punishment is life without the possibility of parole or the gas chamber." Defendant again answered—without any hesitation or uncertainty noted in the record—that he understood. Accordingly, even assuming that such an advisement was required (but see *People v. Blair* (2005) 36 Cal.4th 686, 710 [31 Cal.Rptr.3d 485, 115 P.3d 1145] (*Blair*)), the record shows that defendant was in fact aware of the possibility of a penalty phase of the trial at the time he waived his right to counsel.

As to the other advisements defendant claims should have been given, we find that they were not necessary here. The fact that guilt and penalty phase defenses might in some cases be in conflict, that the burden of proof differs between the two phases of a capital trial, and that some evidence might be admissible at the penalty phase that would not be admissible at the guilt phase are each aspects of the substantive law of a capital case, not dangers and disadvantages arising from a decision to represent oneself in a capital trial. Those and a multitude of other legal aspects of trying a capital case are at issue regardless of whether the defendant opts for self-representation or is represented by counsel. The trial court is not required to ensure that the defendant is aware of legal concepts such as the various burdens of proof, the rules of evidence, or the fact that the pursuit of one avenue of defense might foreclose another before the trial court can determine that a defendant has been made aware of the pitfalls of self-representation, such that he or she can make a knowing and intelligent decision whether to waive the right to counsel.[10] The lengthy advisements given twice in this case warned defendant

---

[10] Indeed, it is improper for a trial court to quiz a defendant on such topics and then draw on the defendant's lack of knowledge of the substantive law as a basis for denying the right to proceed without counsel. (See *People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187] ["the defendant's 'technical legal knowledge' is irrelevant to the court's assessment of the defendant's knowing exercise of the right to defend himself," quoting *Faretta, supra,* 422 U.S. at p. 836].)

that defending against capital charges is a complex process involving extremely high stakes and technical rules defendant would be expected to follow despite his likely unfamiliarity with them, and that defendant's ability to defend himself might be hampered by his incarceration and lack of training. Moreover, the record shows defendant understood the possibility of a penalty phase of the trial that might result in a sentence of death. Accordingly, we conclude defendant adequately was made aware of the " 'disadvantages of self-representation, including the risks and complexities of the particular case,' " and that he made his choice to waive counsel with " ' "eyes open." ' " (See *Blair, supra,* 36 Cal.4th at p. 708; see also *People v. Lawley* (2002) 27 Cal.4th 102, 140–142 [115 Cal.Rptr.2d 614, 38 P.3d 461].) His right to the assistance of counsel, therefore, was not violated.

### B. *Denial of Motion for Change of Venue*

On May 20, 1994, the day *after* the jurors and alternates were sworn, defendant filed a motion for change of venue under section 1033, contending that pretrial publicity created a reasonable likelihood that defendant would not receive a fair and impartial trial. Although the trial court observed that defendant's motion appeared to be untimely,[11] the court, out of an abundance of caution, nonetheless entertained the motion on the merits and denied it. On appeal, defendant contends the denial of the motion was error. We disagree.

■ As an initial matter, it must be emphasized that defendant's change of venue motion was not only filed less than 10 days before trial without any apparent good cause for doing so, it was filed after the jury had been sworn. Thus, defendant's motion was fundamentally different from a motion for a change of venue that complies with the rules, even one in which the trial court denies the motion without prejudice to its renewal during or at the completion of voir dire. In those circumstances, the trial court must determine whether "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) But once the jury has been sworn, the trial court's decision as to venue necessarily must be focused first on whether the jury *already sworn* could properly discharge its duty to decide the case in a fair and impartial manner. (See Code Civ. Proc., § 233; Pen. Code, § 1089; cf. *People v. Miller* (1969) 71 Cal.2d 459, 472–474 [78 Cal.Rptr. 449, 455 P.2d 377] [a renewed change of venue motion made after trial began was properly denied because the court had already excused the prospective jurors who had been tainted by pretrial publicity].)[12] Only if such

---

[11] Former rule 841 (see now rule 4.151) of the California Rules of Court required a motion for change of venue to be made at least 10 days before the date set for trial, except upon a showing of good cause for delay.

[12] Indeed, once a jury has been sworn, jeopardy has attached for purposes of the state and federal constitutional prohibitions against double jeopardy. (*People v. Smith* (1983) 33 Cal.3d

a showing were made would the trial court then consider whether there was a reasonable likelihood that *no* fair and impartial jury could be had in that venue. (See, e.g., *People v. Vieira* (2005) 35 Cal.4th 264, 278 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*) [evaluating the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and the nature and extent of the publicity in terms of the likely impact of publicity on potential jurors].)

Accordingly, we first evaluate the motion as a challenge to the sworn jurors under section 1089 of the Penal Code and section 233 of the Code of Civil Procedure, i.e., whether there was good cause to dismiss the jury due to bias caused by exposure to pretrial publicity.[13] Defendant has not demonstrated that the trial court abused its discretion in failing to find good cause to dismiss the jury. (*People v. Smith* (2005) 35 Cal.4th 334, 348–349 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

As defendant acknowledges, only five seated jurors and one alternate reported that they had heard anything about defendant's case before they were called as jurors. The media coverage detailed in the record, which consisted of copies of 12 articles from two local newspapers, and listed one local television broadcast, one local radio broadcast, and three nationally broadcast episodes of *America's Most Wanted*, was not so extensive that we could conclude that anyone claiming not to have heard of defendant's case must have been untruthful, nor is there any other evidence in the record that would tend to contradict these jurors' statements.

The five seated jurors revealed at most a very rudimentary knowledge of some facts of the case. Juror R.W. stated she had read a newspaper article about a woman who had been driving a Volkswagen who was killed and her car was later found, but R.W. had reached no conclusions about the case. Juror R.B. stated he recalled seeing news reports of the case and may have

---

596, 600 [189 Cal.Rptr. 862, 659 P.2d 1152].) The trial court at that point is charged with evaluating the "legal necessity" of discharging the sworn jury. (*People v. Upshaw* (1974) 13 Cal.3d 29, 33 [117 Cal.Rptr. 668, 528 P.2d 756].) The circumstance that a motion such as defendant's here might later be found to constitute an implied waiver of double jeopardy that would not bar a new trial if a trial court had erroneously dismissed the jury (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 713–714 [87 Cal.Rptr. 361, 470 P.2d 345]) would not relieve the trial court of its duty properly to evaluate in the first instance the legal necessity of discharging the jury. Of course, the interests of the jurors (who by the time they are sworn generally have already devoted significant time to the trial), of the prosecution (which has put effort into obtaining what it believes is a fair jury), and of judicial economy militate against the erroneous granting of a mistrial motion, even if a new trial will not be constitutionally barred.

[13] The trial court to some extent engaged in this form of analysis, in that, in addition to discussing the change of venue factors, it also reviewed at length the responses of each of the sworn jurors and found no evidence of bias in the jury arising from exposure to pretrial publicity.

seen the *America's Most Wanted* broadcasts. He specifically recalled learning that a young woman's body had been found in a citrus grove and that a man and woman had been arrested in conjunction with that killing. He had formed no opinions about the case and could remain objective. Juror B.C. stated he had some recollection of seeing newspaper articles about the case, but remembered no particulars and had not formed an opinion about the case. He thought he could disregard any further details from the newspapers that he might remember during the trial. Juror C.P. stated she remembered viewing newspaper articles and television broadcasts, including *America's Most Wanted*, concerning the case. She recalled that the victim was a young woman who had trusted the people who killed her. She had formed no opinions about the case. During voir dire, she mentioned that the case had made her worried about her own daughter who traveled frequently, and, though she felt that during trial she might "drift off and, you know, start thinking about things that happened or things that I saw on television," she also reiterated that she had not formed any opinions about the case. Juror J.P. recalled reading articles and seeing television broadcasts about the case, including perhaps an episode of *America's Most Wanted*. She remembered that a woman's body had been found in a citrus grove and that defendant had been charged in the killing. She had not formed any opinion about the case.[14]

■ It is notable that defendant did not challenge any of these jurors for cause during voir dire. Indeed, defendant questioned only Alternate Juror E.H. about pretrial publicity, based on his having reported forming a negative impression about the case, and did not question Jurors R.W. and C.P. at all. Although defendant used his full allotment of 20 peremptory challenges, he did not express any dissatisfaction with the final composition of the jury before it was sworn. Moreover, none of the jurors reported remembering the specific details of any of the articles or broadcasts that defendant alleges presented "prejudicial information that should not have been available to the jurors, previewed evidence that would only be produced at a penalty phase, or unduly emphasized information that the jury would be required to assess at the guilt phase." Finally, we observe that much of the media coverage, and in particular the *America's Most Wanted* broadcasts that defendant finds especially prejudicial, occurred several years before the trial. (See *Odle v. Superior Court* (1982) 32 Cal.3d 932, 943 [187 Cal.Rptr. 455,

---

[14] Alternate Juror E.H., who never participated in deliberations, recounted some more detailed knowledge of the facts of the case, including Bowie's car troubles and the burglary of her apartment. He further stated in his questionnaire that he had not formed an opinion concerning defendant's guilt, but he had formed a "negative impression" of defendant. In voir dire, he explained that his negative impression concerned more generally the person who committed the murder, not necessarily defendant, and that he had not formed any opinions about the case and could set aside any prior familiarity with the facts.

654 P.2d 225] ["Time dims all memory and its passage serves to attenuate the likelihood that early extensive publicity will have any significant impact at the time of trial"].)

The trial court found that none of the jurors was affected by pretrial publicity to any degree that would negatively affect his or her ability to serve as an impartial juror in the trial and that Alternate Juror E.H., the lone juror who had formed any kind of impression, had "clearly indicated that he could set aside any impression he had formed." That finding is supported by substantial evidence. We have long held that juror exposure to pretrial publicity regarding a case does not presumptively disqualify the juror; credible assurances that the juror can set aside any preexisting knowledge and opinions about the case and judge it fairly based upon the evidence presented at trial are sufficient to protect defendant's right to an impartial jury. (*People v. Harris* (1981) 28 Cal.3d 935, 949–950 [171 Cal.Rptr. 679, 623 P.2d 240].) The trial court did not abuse its discretion in crediting the jurors' assurances here. Moreover, even in the absence of these credible assurances, defendant was entitled to the discharge of the sworn jury only on a showing of " 'facts that appear " ' "in the record as a demonstrable reality" ' " showing the jury's " ' "inability to perform" ' " its function' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1281 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*)), and the record here did not contain such facts. We therefore conclude the trial court properly denied defendant's motion.[15]

To the extent defendant on appeal contends the trial court erred by not conducting more thorough inquiries of these jurors concerning their exposure to pretrial publicity, he forfeited such a claim of error by failing to raise it below during voir dire, when the trial court could have remedied any alleged inadequacies. Moreover, defendant had the opportunity to question the jurors himself and declined to do so except with respect to Alternate Juror E.H. In addition, defendant has not pointed to any evidence in the record indicating that further questioning would have uncovered any support for a finding that any juror was, in fact, biased against him. He therefore has made no showing that the absence of further questioning by the trial court, even if deemed error, was prejudicial.

### C. *Asserted Error in Death-qualifying Voir Dire*

■ Defendant contends the trial court violated his constitutional rights by excusing for cause two jurors and failing to excuse for cause another juror

---

[15] Because we conclude there was no evidence of good cause to remove any jurors based on their exposure to pretrial publicity, we need not, and do not, consider whether, had there been good cause to dismiss the entire jury, it also would have been proper to grant a change of venue because there was a reasonable likelihood that *no* fair and impartial jury could be had in Riverside County.

based on the jurors' statements concerning their ability to fairly and impartially impose the death penalty. We recently stated the law applicable to such claims: "Qualification to serve on a capital jury is not limited to determining whether the person zealously opposes or supports the death penalty in every case. Under federal and state law, a prospective juror may be excluded for cause where his views on capital punishment would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' ([*Wainwright v. Witt* (1985)] 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844], clarifying *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 88 S.Ct. 1770] [framing issue as whether it is 'unmistakably clear' the prospective juror would 'automatically' . . . vote for life or death].) The *Witt* standard applies to both prosecution and defense challenges. [Citations.] At bottom, capital jurors must be willing and able to follow the law, weigh the sentencing factors, and choose the appropriate penalty in the particular case. [Citations.]

"The trial court's findings as to the nature and effect of a prospective juror's views on capital punishment and related topics (e.g., law enforcement) receive substantial deference on appeal. [Citations.] Indeed, where answers given on voir dire are equivocal or conflicting, the trial court's assessment of the person's state of mind is generally binding on appeal. [Citation.] The trial court is in the unique position of assessing demeanor, tone, and credibility firsthand—factors of 'critical importance in assessing the attitude and qualifications of potential jurors.' (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2224].) Hence, the trial judge may be left with the 'definite impression' that the person cannot impartially apply the law even though, as is often true, he has not expressed his views with absolute clarity. ([*Wainwright v.*] *Witt, supra*, 469 U.S. [at pp.] 425–426.)" (*People v. DePriest* (2007) 42 Cal.4th 1, 20–21 [63 Cal.Rptr.3d 896, 163 P.3d 896] (*DePriest*).) We decline defendant's invitation to revisit our past decisions establishing this standard. (*People v. Schmeck* (2005) 37 Cal.4th 240, 262–263 [33 Cal.Rptr.3d 397, 118 P.3d 451].) Affording the trial court's decisions the deference which they are owed, we conclude the trial court did not err.

### 1. Assertedly Improper Exclusion of Jurors Who Were Biased Against Imposition of the Death Penalty

Defendant contends the trial court improperly excused for cause two prospective jurors, F.G. and J.F., who expressed some reservations about their ability to impose the death penalty, because, he argues, these prospective jurors indicated they could follow the trial court's instructions and impose the death penalty in an appropriate case. We are not persuaded.

F.G. stated in her juror questionnaire that she was strongly against the death penalty because "GOD would do the punishing and I'm in agreement."

Although she believed her church opposed the death penalty due to the commandment "Thou shalt not kill," she did not feel obligated to accept the church's view. She stated, however, that she preferred not to serve as a juror in this case because she did not "want anyone's blood on my hands when I die and have to answer to GOD," and would not be a fair and impartial juror because "I'd not be good if it came to the penalty phase and death was the appropriate penalty." F.G. did not answer the question "if you believe under the evidence presented and the legal standard you will be advised of that death is the appropriate penalty, you could return such a verdict," and wrote "not sure" when asked whether she could vote to impose the death penalty in a case involving a robbery special circumstance. She had earlier given conflicting answers to similar questions. Two of her answers indicated she would not always vote for or against the death penalty regardless of the evidence, and two others indicated she "disagree[d] somewhat" with the statements that someone who intentionally kills another person always or never should receive the death penalty. She answered "yes" when asked if in an appropriate case she could reject the death penalty and choose a life without parole sentence. Seemingly contradicting these answers, however, F.G. answered "no" when asked in the next question if she could reject a life without parole sentence and choose the death penalty in an appropriate case.

During voir dire, F.G. told the trial court that her views about the death penalty had changed somewhat due to a discussion at her church Sunday school class in which the minister stated that one must "follow the law of the land" in situations where a person might be called upon to kill another person. She at first stated that she now was more confident that she could vote to impose the death penalty in an appropriate case and was only "moderately opposed" to the death penalty in general. F.G. said she now believed that by consulting with God through her prayers during the trial, she would not be "going against Him" if she voted for the death penalty. F.G. also said that she would pray for guidance because "this is something that I don't want to be the only one making the decision. I want some kind of answer from Him." F.G., however, also stated she did not feel she should be the one to decide whether the death penalty should be imposed, and "wouldn't want to be in the position to have to do it." After the trial court explained that the questions F.G. was being asked pertained to whether she could vote for the death penalty in a general sense—not whether she would actually vote for or against the death penalty in this case—the trial court finally asked her, "if you go in and you say, well, considering all of the evidence in mitigation, all of the evidence in aggravation, we [the jury] believe that the appropriate penalty is death, then could you . . . vote for that

alternative." F.G. responded, "I'll say, no. I'm—I just really don't know. I'd rather say no than now say yes and get to that point and not be able to follow the law."

The trial court granted the prosecution's motion to excuse F.G. for cause, noting that it found that she had tried to answer the questions truthfully, and the challenge was a "real close call . . . or at least was until her absolute last answer." The court found that this last answer, i.e., that F.G. did not think she could vote to impose the death penalty, in combination with F.G.'s stated desire not to be placed in the position of having to make that choice, indicated that her ability to be impartial would be substantially impaired.

We cannot conclude the trial court erred by excusing F.G. for cause. Her voir dire answers indicated a continued strong aversion to being placed in the position of having to choose to impose the death penalty if that was the appropriate sentence, and her belief that, at best, she might be able to do so because she was required to "follow the law of the land" and would have guidance from God to help make her decision. As we have said before in similar circumstances, "[t]he prospective juror's answers were equivocal and conflicting. Those answers, in combination with the trial court's firsthand observations, could give rise to a definite impression that [F.G.]'s views on the death penalty would substantially impair the performance of [her] duties. We therefore defer to the court's ruling." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007 [47 Cal.Rptr.3d 467, 140 P.3d 775]; see also *DePriest, supra,* 42 Cal.4th at p. 22.)

We reach a similar conclusion regarding the trial court's decision to excuse Prospective Juror J.F. His answers in the juror questionnaire also were conflicting: he answered that he was moderately in favor of the death penalty, that he would not automatically vote for or against the death penalty, and could return such a verdict in an appropriate case. He answered "no," however, when asked whether he could vote to impose the death penalty in a case involving a robbery special circumstance, and "no" again when asked whether in an appropriate case he could reject a life without parole sentence and vote to impose the death penalty.[16] J.F. also stated that he believed a life sentence was a worse punishment than death because death was "the fast way out." He explained that his view of the death penalty was based on his belief that "God will do the punishing."

When questioned during voir dire about his conflicting answers, J.F. stated that he did not "believe in" the death penalty because of his religious views,

[16] Like F.G., in response to the prior question asking whether in an appropriate case J.F. could reject a sentence of death and instead vote for life without parole, J.F. answered "yes."

but he "guess[ed]" he might be able to "bend" to vote for the death penalty in a "really terrible" case or "very extreme circumstances" such as a serial murderer or the murder of a child. He also stated, however, that he would be uncomfortable having to make the penalty decision, and guessed he could not be a fair juror for the prosecution. The trial court ultimately asked J.F. whether, based upon the charges in this case of murder and a robbery-murder special circumstance, and realizing there might be aggravating and mitigating evidence presented at trial, he saw "any possibility of your voting for the death penalty in this case." J.F. responded, "No." The trial court noted for the record that J.F.'s answer was immediate and unequivocal, and J.F. concurred in that characterization. The court, citing our decision in *People v. Cummings* (1993) 4 Cal.4th 1233, 1279–1281 [18 Cal.Rptr.2d 796, 850 P.2d 1], granted the prosecution's challenge for cause, finding that J.F.'s answers suggested that he would automatically vote against the death penalty regardless of the evidence in this case.

To the extent that J.F.'s answers left any doubt about his inability to impartially determine the appropriate penalty in this case,[17] as with the decision to excuse F.G., we will defer to the trial court's resolution of that uncertainty, given that his answers were at the least conflicting and equivocal, and could be viewed as indicating he would be substantially impaired in discharging his duty as a juror. Accordingly, we find no violation of defendant's constitutional rights in the trial court's excusal of Prospective Jurors F.G. and J.F. for cause.

> 2. *Assertedly Improper Denial of Challenge for Cause of a Juror Who Was Biased in Favor of Imposition of the Death Penalty*

Defendant contends the trial court erred by refusing to excuse for cause Juror A.M., who served on the jury throughout the guilt and penalty phases of the trial. We are not persuaded.

As an initial matter, although defendant exercised all of his peremptory challenges, he failed to express dissatisfaction with the final jury before it was sworn. Because defendant's trial occurred before our decision in *People v.*

---

[17] Defendant argued that J.F.'s answer—that he could not envision voting to impose the death penalty in a robbery-murder case—did not definitively settle the question whether he might be able to vote for such a verdict in defendant's case because evidence of defendant's having shot and killed his brother might meet J.F.'s definition of "very extreme circumstances" in that he might find that defendant was a "serial killer or a multiple killer." The trial court rejected this argument, finding that the court's question had not foreclosed that possibility, and J.F. had answered immediately and unequivocally that based on the robbery-murder charges in this case, he could not see a possibility of voting for the death penalty.

*Crittenden* (1994) 9 Cal.4th 83 [36 Cal.Rptr.2d 474, 885 P.2d 887] (*Crittenden*), though, we will not apply the holding in that case that the failure to do so forfeits an appellate claim that the trial court erred by denying a challenge for cause. (*Id.* at p. 121, fn. 4; see *Blair, supra,* 36 Cal.4th at p. 742.) As to the merits of his claim, in determining whether Juror A.M. was biased and should have been excused for cause, we apply the same standard discussed above, i.e., whether the record establishes that the juror's views concerning the death penalty would prevent or substantially impair the performance of the juror's duties. We defer to the trial court's findings of the true state of mind of the juror when the juror's answers were conflicting or ambiguous. (*Blair, supra,* at pp. 741, 743.)

Juror A.M.'s circumstances were essentially the same as those of the jurors we discussed in *Blair,* with one notable exception, which we will discuss below: initially Juror A.M. "expressed some variation of the view that . . . she would vote for the death penalty in all cases of intentional, deliberate, or premeditated murder. Nonetheless, after the trial court and sometimes the prosecutor explained that the death penalty was not mandatory if the defendant was found guilty of murder with special circumstances, but instead that there would be a separate penalty phase at which the parties would have the opportunity to present aggravating and mitigating evidence relevant to punishment, [she] expressed a willingness to consider all of the evidence and both available penalty options before deciding on the appropriate punishment." (*Blair, supra,* 36 Cal.4th at p. 743.)

The only significant difference here, upon which defendant focuses our attention, is that Juror A.M. also stated in her questionnaire with regard to mitigating evidence that she did not "see why someone's past has anything to do with what they are charged with today or when they committed the crime." Similarly, during voir dire, she initially stated that she did not think she "would use [background information] as a factor in my decision since I don't think it's pertinent to, you know, what's on hand, the crime. . . . I wouldn't take it into consideration." She agreed that it was her view that she would give such evidence "no weight at all." Juror A.M. ultimately stated, however, that she could reject the death penalty in an appropriate case based on "the rest of the evidence, you know, if—I don't know how. Just depending on the evidence and stuff because we have our own opinion. We have to come to a consensus about it. We have to, just other than the good things and stuff, just all the evidence brought forth to support that he wouldn't deserve."

■ Defendant argues on appeal as he did in the trial court that Juror A.M.'s statements about her view of the merit of a defendant's personal background as evidence in mitigation show that her ability to be fair and impartial and to follow the law was substantially impaired. We disagree.

Juror A.M.'s statements are properly understood as explaining her then existing view of the relative weight of one particular type of mitigating evidence. As the United States Supreme Court recognized in *Patton v. Yount* (1984) 467 U.S. 1025, 1039 [81 L.Ed.2d 847, 104 S.Ct. 2885], "[i]t is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently." We therefore do not believe Juror A.M.'s statement that she would not "take into consideration" defendant's background should be read literally, but rather we interpret this comment in relation to her statement that she did not, at that time, see the relevance of such evidence.

At bottom, Juror A.M. expressed strong skepticism at the abstract suggestion that the personal background of a defendant could mitigate the seriousness of having committed murder. The fact, however, that during voir dire a juror expresses a negative opinion about the persuasive value—in theory—of a certain class of mitigating evidence, does not establish that the juror's performance of his or her duty will be substantially impaired. Juror A.M. never said she would not weigh the aggravating and mitigating evidence in reaching her decision; in fact, she said she would do so. Her statements concerning personal background evidence meant only that Juror A.M.—a layperson who had never before been involved in a capital trial—did not at that time see the relevance of such evidence in the determination of the appropriate sentence. The fact that this preexisting view might have made it more difficult for defendant to *convince* Juror A.M. of the relative strength of a mitigation case that included evidence of defendant's background does not prove that she would automatically vote for the death penalty,[18] or that her belief prevented or substantially impaired the performance of her duties as a juror to follow the trial court's instructions to weigh the evidence to be offered. (Cf. *People v. Stewart* (2004) 33 Cal.4th 425, 447 [15 Cal.Rptr.3d 656, 93 P.3d 271] ["A juror might find it very difficult to vote to impose *the death penalty*, and yet such a juror's performance still would not be substantially impaired under *Witt*, unless he or she were unwilling or unable to follow the trial court's instructions by weighing the aggravating and mitigating circumstances of the case and determining whether death is the appropriate penalty under the law."].) As the Supreme Court of Kentucky aptly stated in similar circumstances: "Voir dire examination occurs when a prospective juror quite

---

[18] For instance, Juror A.M. might have been convinced that the aggravating factors in this case alone did not warrant imposition of the death penalty, without giving any weight at all to any mitigating evidence defendant presented.

properly has little or no information about the facts of the case and only the most vague idea as to the applicable law. At such a time a juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment. Similarly, many citizens are astounded to learn that being under the influence of drugs or alcohol [or, as here, the defendant's personal background] may be considered by them as factors mitigating the punishment which should be imposed. Predictably, when asked whether they believe being under the influence should mitigate punishment, the answer is often in the negative. A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination. The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." (*Mabe v. Com.* (Ky. 1994) 884 S.W.2d 668, 671.)

Affording the proper deference to the trial court's assessment of Juror A.M.'s ability to follow the law and to weigh the evidence for and against the death penalty—ultimately assigning whatever weight she deemed appropriate to the evidence on each side—we conclude the trial court did not err in denying the challenge for cause, and, accordingly, defendant was not denied his right to a fair and impartial jury.

D. *Guilt Phase Claims*

1. *Assertedly Erroneous Admission of Videotape of* America's Most Wanted *Television Show*

The disappearance and murder of Jamie Bowie was featured several times on the nationally broadcast television program *America's Most Wanted,* including one segment that was broadcast after defendant and Hilda Riggs were arrested and charged with Bowie's murder and Hilda had decided to cooperate with the authorities. Defendant moved before trial to exclude these broadcasts from being shown to the jury during the trial. The trial court deferred ruling on the motion at that time. When the prosecution gave notice that it intended to show a portion of an episode during opening statements of the guilt phase of the trial, however, the trial court sustained defendant's objection to the prosecution's proposal, noting that the segment at issue contained dramatic elements that made it a "very powerful, persuasive piece."

Later, during the testimony of Investigator Pina, the prosecution gave notice that it intended to show the jury the *America's Most Wanted* episode

that aired after defendant was arrested, which included a recounting of the crime based on Hilda's statements to the police. The prosecutor argued that the television program was admissible as an "adoptive admission" under section 1221 of the Evidence Code because defendant told Pina in his statement made several days after the episode aired that he had watched the program and "it happened exactly like she told you, except for the most important things of the case she left out."[19] Defendant objected on the ground that he, at most, had adopted only part of what Hilda had told the police, not the program itself, which included visual and sound elements that were merely part of the dramatic presentation. He further argued that any probative value of the show was outweighed by the prejudicial effect of those dramatic elements and was cumulative of other evidence, and therefore should be excluded under section 352 of the Evidence Code. After viewing the episode, the trial court ruled that the portion recounting what Hilda told the police could be shown to the jury. That segment was then played to the jury, and the videotape was entered into evidence.

Defendant contends on appeal that the trial court abused its discretion by allowing the prosecution to show the edited segment to the jury because it included irrelevant elements and was cumulative and unduly prejudicial.

As an initial matter, respondent argues that defendant forfeited his challenge to the trial court's decision by choosing to show the entire episode, including portions the trial court had earlier excluded, to the jury during the defense opening statement. We will assume, however, that defendant's decision to do so was an instance of a party making the best of an allegedly erroneous ruling, and therefore does not bar his claim on appeal. (See *People v. Calio* (1986) 42 Cal.3d 639, 643 [230 Cal.Rptr. 137, 724 P.2d 1162].) We observe nonetheless that defendant's decision to show the tape to the jury again, and to include portions the trial court had excluded, undercuts his claim on appeal that the first showing by the prosecution was unduly prejudicial.

█ In reviewing the trial court's decision to allow the prosecution to show the edited portion of the program to the jury, we note that all relevant evidence is admissible at trial and that the trial court "has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence." (*People v. Carter* (2005) 36 Cal.4th 1114, 1166–1167 [32 Cal.Rptr.3d 759, 117 P.3d 476]; see Evid. Code, § 351.) Relevant evidence includes all "evidence . . . having any tendency in reason to prove . . . any

---

[19] Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) ■ Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome [citation].' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724 [94 Cal.Rptr.2d 396, 996 P.2d 46].) On appeal, we review the trial court's rulings concerning the admissibility of the evidence for abuse of discretion. (*People v. Thornton* (2007) 41 Cal.4th 391, 444–445 [61 Cal.Rptr.3d 461, 161 P.3d 3]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1171 [13 Cal.Rptr.3d 34, 89 P.3d 353].) We find no abuse of discretion in the present case.

The edited portion of the episode played for the jury is approximately one minute 20 seconds in length, consisting of the following scenes: depictions of a map of the route Bowie, defendant and Hilda traveled from the time they met to the site where Bowie was killed; Investigator Pina speaking in front of the ATM in Indio, where defendant attempted to withdraw money on the night of the murder; a Black male and a blonde woman, presumably depicting defendant and Bowie on an occasion when her car was broken down, standing and talking next to a road; the exteriors of the Sizzler's restaurant in Banning where Bowie, defendant and Hilda ate dinner, and of the Indio bank and ATM; a reenactment of the murder, which is described in more detail below; and footage of Investigator Pina interviewing Hilda at the scene of the murder. The soundtrack includes the voices of Investigator Pina and the narrator of the program describing what Hilda told the police, Hilda's statements to Investigator Pina at the scene, and occasional, very brief musical interludes.

Defendant does not contend that the edited portion of the episode was entirely irrelevant, but rather that it contained dramatic elements that were not part of what Hilda had told the police, and, accordingly, were not "adopted" by defendant. We conclude, however, that the trial court did not abuse its discretion in allowing the jury to see the edited segment itself, including the visual and audio elements, in order to give full context to defendant's statement that he saw the episode and agreed, to some degree, with what was depicted in it.

We also agree with the trial court that the probative value of the edited portion of the show was not substantially outweighed by the potential for needless consumption of time or undue prejudice. The segment shown to the jury was very brief—less than one and a half minutes in length—so to the extent that it might have been considered cumulative of other evidence, such

as the in-court testimony of Investigator Pina and Hilda, we cannot say the trial court would necessarily have abused its discretion in finding that the consumption of time in showing the video was insignificant.

As to possible undue prejudice, we observe that the majority of the visual content of the portion played to the jury was quite neutral: maps of the area, Investigator Pina speaking to the camera, and footage of Hilda's interview at the crime scene. The dramatization of defendant and Bowie talking on the side of the road had no possibly prejudicial aspects.[20] Defendant mentions the presence of music during the segment, but these excerpts were very short, lasting merely a few seconds at a time, and could not have caused any undue emotional reaction in the jurors.

While the reenactment of the murder, which fell approximately in the middle of the segment shown to the jury, had some potential to create prejudice, we again cannot conclude that the trial court abused its discretion in finding that any potential prejudice did not substantially outweigh the probative value of the segment. The reenactment scene was less than nine seconds long. Its visuals consisted of a person's feet walking on a dirt path; the silhouettes of one person raising a shotgun and pointing it at another person; a closeup view of a young blonde woman's face, who appears to scream; and then a wider shot of the woman turning and running, which then fades out. During this scene, Investigator Pina's voice is heard saying that the unsuccessful attempt to withdraw money from the ATM "really upset the male suspect, Billy. At this time, she was taken to the abandoned orchard. She was shot twice with a shotgun blast to the back." As the picture of the woman running fades out, there is a musical tone lasting approximately one second, and the sound of a gun being fired twice.

The shooting of Jamie Bowie was a violent act, of which the jury had already heard and observed extensive evidence in the trial. The extremely brief depiction of the murder, which did not show the victim actually being shot or the aftermath of the shooting, did not pose an intolerable risk of negatively affecting the fairness and reliability of the proceedings such that we could conclude the trial court abused its discretion by allowing the jury to see it.

In sum, we cannot conclude that the admission of the edited portion of the episode played for the jury constituted an abuse of discretion. As mentioned above, the fact that defendant himself chose to play the segment to the jury a

---

[20] Indeed, defendant in his opening statement made use of this portion of the segment, pointing out that the male actor was much taller than defendant.

second time, including portions the trial court had previously excluded, undercuts his claim on appeal that the show's dramatic elements were unduly prejudicial.[21]

To the extent defendant on appeal raises a federal constitutional claim distinct from his claim that the trial court abused its discretion under Evidence Code section 352, he forfeited this claim by failing to identify that ground in his objections to the trial court. (*People v. Partida* (2005) 37 Cal.4th 428, 437–438 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*).) To the extent any constitutional claim is merely a gloss on the objection raised at trial, it is preserved but is without merit because the trial court did not abuse its discretion in admitting the evidence. (*Prince, supra*, 40 Cal.4th at p. 1229.)

### 2. *Assertedly Erroneous Admission of Battered Woman Syndrome Evidence*

As described in more detail above, Hilda Riggs testified on direct and cross-examination that she did not attempt to prevent Bowie's murder and did not abandon defendant after the murder and report the crime to the police because he physically and mentally abused her and threatened to harm her and members of her family. The prosecution also called an expert witness to testify concerning BWS, who testified in response to a hypothetical question paralleling Hilda's testimony that Hilda's actions were consistent with "battered woman accommodation syndrome." Defendant objected at trial to the expert testimony on the ground that it was irrelevant. On appeal he renews this challenge to the testimony.[22] We conclude it is without merit.

---

[21] Defendant contends for the first time on appeal that the trial court should have given an instruction to the jury to "ameliorate the prejudice attendant to the use of a commercial television recreation of the events in any way." He forfeited this claim by failing to request such an instruction at trial. (*People v. Boyer* (2006) 38 Cal.4th 412, 465 [42 Cal.Rptr.3d 677, 133 P.3d 581].) Moreover, we discern no possible prejudice from the absence of an instruction pointing out what would be obvious to the jury—essentially that the television show was not a recording of the actual events. Indeed, we note that defendant himself showed the televised dramatization to the jury without requesting any instruction to that effect.

[22] Defendant also contends the trial court erred by failing to consider the prejudicial effect of the BWS evidence, and thereafter not excluding it under Evidence Code section 352. Defendant did not raise an objection on the basis of undue prejudice at trial, and therefore has forfeited that appellate challenge. (*People v. Clark* (1992) 3 Cal.4th 41, 125–126 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Moreover, this claim is misdirected. The possible undue prejudice of which defendant complains on appeal—i.e., that "BWS testimony involves uncharged misconduct evidence and 'creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged' "—would have stemmed from Hilda's testimony about the abuse defendant inflicted on her, not the expert's testimony about the principles of BWS. Defendant made no objection whatsoever to Hilda's testimony about the abuse, and, in fact, cross-examined her at length on that subject. In addition, the jury was instructed that the expert's testimony was offered not to prove that Hilda had in fact been

Defendant argues essentially that BWS testimony was not relevant in this case because he did not attack Hilda's credibility on the basis of any myths or misperceptions that the jury might have had that could have been explained by BWS evidence. He points out that it was the prosecutor who first brought up the issue of physical abuse and threats during Hilda's direct examination, and argues that the defense did not seek to exploit Hilda's failure to stop the murder or to flee from defendant afterwards. Even assuming defendant is correct in this regard, this does not mean the BWS testimony was irrelevant and inadmissible, because there is no requirement that the defendant explicitly challenge a witness's credibility on a basis that might be explained by BWS evidence before such evidence may be introduced.

■ As defendant acknowledges, expert BWS testimony is relevant to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand. (*People v. Humphrey* (1996) 13 Cal.4th 1073 [56 Cal.Rptr.2d 142, 921 P.2d 1].) The use of BWS evidence in this manner is statutorily authorized by Evidence Code section 1107. (Evid. Code, § 1107 ["[i]n a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence . . ."].) The relevance of this evidence is based on the possibility that the jurors will doubt that a witness who claims to have been abused has indeed acted in the manner to which he or she testified, and therefore the jurors might unjustifiably develop a negative view of the witness's credibility. (*People v. Brown* (2004) 33 Cal.4th 892, 906–908 [16 Cal.Rptr.3d 447, 94 P.3d 574].) Even if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled by BWS evidence. Thus, there is no need for the defendant first to bring up the potential inconsistency between a witness's actions and his or her testimony before the prosecution is entitled to attempt to dispel any misperceptions the jurors may hold by introducing BWS evidence, provided, of course, that there is an adequate foundation for a finding that the witness has been affected by BWS. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745 [32 Cal.Rptr.2d 345].)

■ In the present case, there was an adequate foundation and the BWS evidence was highly relevant, regardless of how defendant actually sought to challenge Hilda's testimony. In the absence of the BWS evidence, the jury might have discredited Hilda's testimony based upon a misconception that

battered but "only for the purpose of understanding and explaining, if it does, in your opinion, the behavior of Hilda Riggs in this case and in her testimony."

anyone who was physically and mentally abused in the severe manner to which she testified would not have remained in a relationship with her abuser, even when he was incarcerated in a different state from where she was residing. Moreover, the BWS evidence was especially relevant in the present case because, while Hilda accused defendant of having shot Bowie, defendant in his statements to the police said that it was Hilda who committed the murder. In addition, as it turned out, defendant ultimately presented an alibi defense, appearing to shift the entire blame for the crime to Hilda and Robert Beverly. Without expert testimony explaining that an abused person's failure to act to prevent a crime by her abuser and her subsequent failure to leave the perpetrator and report the crime is consistent with a psychological syndrome caused by the abuse, the jury might have mistakenly believed the only reasonable explanation for Hilda's failure to do these things was that defendant's statements to the police and his defense at trial were true—in other words, that Hilda did not prevent the crime or leave defendant and report it because she, in fact, was the murderer. For these reasons, the trial court did not abuse its discretion in finding the BWS evidence was relevant.

### 3. Asserted Error in Trial Court's Decision to Deem the Defense Case Completed

Throughout the pretrial proceedings and the trial, defendant vociferously complained that he was not provided with sufficient funds to conduct his defense. This issue came to a head during the guilt phase defense case-in-chief when defendant claimed he was unable to properly serve subpoenas on several witnesses due to the lack of funds to pay his investigator, and, after several continuances, the trial court deemed the defense to have rested, despite defendant's expressed desire to call three additional witnesses.

Prior to the trial court's decision to deem the defense case completed, the court had granted defendant's requests for several continuances, and the jury had been dismissed early on several occasions because none or only some of defendant's scheduled witnesses had appeared. After the prosecution's case-in-chief was completed, the court granted an 11-day continuance for defendant to secure the attendance of his witnesses. On Thursday, June 23, 1994, after the defense case had begun, the jury was excused because defendant announced that the witness who had appeared "has nothing for us" and that the other intended witness had not appeared. The next day, the jury was again dismissed because no defense witnesses appeared. On the following Monday, defendant again failed to produce any witnesses. At defendant's request, the trial court excused the jury and continued the trial one extra day, to Wednesday, June 29, 1994, in order to give defendant an opportunity to ensure that his witnesses would appear.

On the appointed day, defendant again had no witnesses to present to the jury. In granting yet another continuance, the trial court warned defendant, "I have been more patient, I believe, than the law requires. And I believe that I have attempted to give you every opportunity that you need to put on your case the way that you believe it should be put on. [¶] But as I told you the other day, with respect to the jury, that bank account of good will they have with us is running out. So, too, my ability to let you impose on this jury is running out. We're going to have tomorrow . . . and we'll hear what witnesses you have tomorrow, sir. [¶] But I do need to tell you that we are approaching the point that I'm going to ask you to call your next witness and, if you tell me you don't have a witness, then I'm going to ask you to rest your case. [¶] You're either going to need to put on the witnesses or we'll continue to the next phase of the case, which would be rebuttal testimony, if there is any, and argument. [¶] And that is not a threat at all, it's just I want you to be aware of what is going to come because I cannot continue to let the jury come in here day after day and tell them, go home, we don't have any witnesses." The trial court asked defendant whether he had "[a]ny problem with my telling the jury that there is some closure in the offing and that we do expect that the defense case will probably rest by [the following] Tuesday or so" and defendant agreed that was correct.

On Tuesday, July 5, 1994, after defendant's alibi witnesses testified, defendant did not have any other witnesses present. The prosecution then offered, out of order, two rebuttal witnesses. The defense stated that it intended to call its four remaining witnesses the following day.

The next day, Wednesday, July 6, 1994, defendant again stated that three of his witnesses were not present, due to a delay in securing funds for personal service of the witness subpoenas. Defendant acknowledged that the trial court had been accommodating and stated that the defense would not rest and would instead "leave that up to the Court." After the defense investigator testified, the trial court conducted an in-chambers hearing concerning defendant's remaining witnesses. The trial court concluded it would allow one final continuance until 1:30 p.m. the following day for the presentation of defendant's remaining witnesses. The prosecution then called defendant's alibi witnesses as out-of-order rebuttal witnesses. At the conclusion of the proceedings that day, the trial court told the parties, "I do want to be clear, and not that I want to dredge up that issue, but I do want everyone to understand where I am coming from with respect to the calling of witnesses tomorrow. [¶] I do anticipate that we will finish with witnesses tomorrow unless it gets to be the case that we have so many witnesses that we run until 5:00 and we need to come back the next day. But absent that possibility, it is my intention to conclude with witnesses tomorrow. . . . If you have a witness that you want this jury to hear, I expect them to be here tomorrow."

On Thursday July 7, 1994, when the trial court asked defendant to produce his next witness and defendant stated that there were no more witnesses available—but the defense did not rest its case—the court "deem[ed] that the defense has rested its case in chief."

Defendant contends on appeal that the trial court's decision not to grant further continuances to allow him to attempt to bring in the additional witnesses violated his rights to due process, compulsory process, a reliable verdict, and to present a complete defense, in violation of the state and federal Constitutions. Assuming for the sake of argument that defendant's refusal to rest his case-in-chief preserved his claim that the trial court abused its discretion and violated his constitutional rights by deeming the defense case completed, defendant's contention is nonetheless without merit.

 Continuances in criminal cases may be granted only for good cause. (§ 1050, subd. (e).) "A 'trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial. [Citation.] A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence.' [Citation.] Such discretion 'may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' [Citation.] 'To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 670 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*).)

In the present case, the trial court did not abuse its discretion in finding that there was no good cause to allow further delay in the completion of the defense case-in-chief. Initially, the trial court could have properly found that the inability to have these witnesses available was caused by defendant's lack of diligence, such as repeatedly attempting service on out-of-state witnesses by mail, despite being advised that such procedures were not proper, and not by factors beyond defendant's control. (See *People v. Grant* (1988) 45 Cal.3d 829, 844 [248 Cal.Rptr. 444, 755 P.2d 894].)

Even if defendant's excuse of insufficient funds were a genuine one, the trial court would not have abused its discretion in finding that the remaining witnesses were not essential to preserving defendant's " 'reasonable opportunity to prepare a defense and respond to the charges.' " (*Roldan, supra*, 35 Cal.4th at p. 670; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1038 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*) [the trial court did not abuse its discretion in denying a continuance when defendant failed to establish that "a continuance would be useful in producing specific relevant . . . evidence within a reasonable time" in light of the burden further delay would place on

the jury, other witnesses, and the court].) Contrary to defendant's assertion on appeal that the missing witnesses would have supported his alibi defense, the offers of proof he made at trial showed that these witnesses had nothing to do with establishing defendant's whereabouts, and, further, that their testimony would have been of little assistance to him.

According to defendant's offers of proof, the three witnesses' testimony essentially would have bolstered Bessie Hodges's testimony that it was possible that Jamie Bowie was not killed on April 16, 1990, and was seen alive several days later.[23] Such testimony was immaterial, as it was speculative at best—since none of them could positively testify that Bowie was alive after April 16—and, in fact, the intended import of their proposed testimony was overwhelmingly contradicted by other evidence: that Bowie had no apparent reason not to return to Los Angeles on April 16, but rather had a significant reason to do so (her new job starting the next day); that while alive she had faithfully communicated with her family and friends, but never talked with any of them after April 16; that her ATM card was unsuccessfully used three times in rapid succession the next morning in the Los Angeles area; that her apartment was burglarized with no sign of forced entry that same morning; that defendant sold her car in Fresno on April 18; and, of course, defendant's statements to the police and Hilda's testimony that Bowie was killed on April 16. The notion that Bowie was not killed on that day was simply preposterous, and the trial court's decision not to further delay the trial so defendant could attempt to bring in three witnesses who, judging from defendant's offers of proof, would not have provided remotely convincing evidence to the contrary was not an abuse of discretion. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1171 [5 Cal.Rptr.2d 268, 824 P.2d 1315] [in order to justify a continuance to obtain witness testimony, defendant must show that the "expected testimony was material and not cumulative . . ."].)[24] Because we conclude the trial court acted within its broad discretion in denying a continuance, defendant's constitutional claims are foreclosed. (*Jenkins, supra*, 22 Cal.4th at pp. 1039–1040.)

---

[23] According to the offers of proof, Jim Jones's testimony would have been "basically the same as Miss Bessie Hodges" in that he may have seen someone who resembled Bowie in a similar Volkswagen convertible on April 21, 1990; Janet Collier would have testified that she saw Bowie and her car at a truckstop in Arizona several days after she had been reported missing (although it appears this offer of proof was contradicted by defendant's own investigator's report, which indicated that Collier had seen Bowie when she was driving to Arizona *before* she was killed); and Ottho Breazille would have testified that he participated in air and ground searches for Bowie on April 16 or 17 and did not find Bowie's body, despite having searched in the area where it was eventually found.

[24] For the same reasons, even if we were to conclude the trial court had abused its discretion, defendant would not be entitled to relief because he cannot demonstrate prejudice to his defense arising from the absence of these witnesses. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1126 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

### 4. *Asserted Prosecutorial Misconduct*

■ Defendant raises numerous claims of prosecutorial misconduct under both the state and federal Constitutions. Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. (*People v. Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464] (*Wainwright*), quoting *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].)

" '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " (*People v. Stanley* (2006) 39 Cal.4th 913, 952 [47 Cal.Rptr.3d 420, 140 P.3d 736] (*Stanley*).) To the extent defendant invites us generally to disregard this requirement in the present case and to review otherwise forfeited claims of misconduct based upon the fact that defendant represented himself at trial, or the notion that the trial court had an independent duty to remedy unobjected-to prosecutorial misconduct in order to control the proceedings, we decline to do so. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1153, fn. 24 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Barnum* (2003) 29 Cal.4th 1210, 1224 [131 Cal.Rptr.2d 499, 64 P.3d 788].) To the extent defendant claims that an objection and request for an admonition with regard to particular alleged misconduct would have been futile or ineffective, we will address that issue below on a claim-by-claim basis. Because, as discussed below, we conclude that the prosecutor committed no prejudicial misconduct, it follows there was no pervasive misconduct that otherwise excused defendant's failure to object to the individual instances of misconduct of which he now complains. (Cf. *People v. Hill* (1998) 17 Cal.4th 800, 820–821 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

### a. *Asserted Violation of* Doyle v. Ohio

Defendant asserts the prosecutor violated the prohibition against commenting on a defendant's postarrest silence under *Doyle v. Ohio* (1976) 426 U.S.

610, 618 [49 L.Ed.2d 91, 96 S.Ct. 2240] (*Doyle*), when he asked Inspector Pina whether, during his first interview with the police after his arrest, defendant "provide[d] any statements that were of evidentiary significance to your investigation," and Pina answered, "No, not at that time." Defendant did not object to the question or request an admonition concerning the exchange. Only after the *trial court* noted the possibility that the question and answer might be interpreted as a reference to defendant's assertion of his *Miranda* rights at the first interview did defendant agree with the court's proposed admonition to the jury to disregard the reference to the first interview. He therefore has forfeited this claim.

Even if defendant had not forfeited this claim, we would conclude it is without merit. It is evident from the record that when viewed in context, the prosecutor's question was not designed to impeach defendant's later statements to the police by reference to his earlier decision not to talk with them, which is the harm the holding of *Doyle* seeks to prevent. Indeed, the prosecutor did not actually ask whether defendant had invoked his right to silence or even had been silent, but rather whether the first interview yielded any valuable information for Pina's investigation. The prosecutor's question, it appears, was intended simply to dispel in an innocuous manner any confusion why Pina's testimony about the interviews started with the second time he spoke with defendant. We doubt that any member of the jury would have understood this oblique reference to the first interview as a comment on defendant's assertion of his right to remain silent during police questioning, and certainly there was no overt attempt by the prosecution to rely on any inconsistency between those interviews as a means of impeaching him. Moreover, even if we were to conclude that the prosecutor had violated *Doyle*, the trial court's admonition to disregard any mention of the first interview was adequate to eliminate any possible prejudice because we assume the jury followed the admonishment and that prejudice was therefore avoided. (*People v. Jones* (1997) 15 Cal.4th 119, 168 [61 Cal.Rptr.2d 386, 931 P.2d 960] (*Jones*); see also *People v. Hinton* (2006) 37 Cal.4th 839, 867–868 [38 Cal.Rptr.3d 149, 126 P.3d 981].)

b. *Questions Concerning Investigator's Opinions of Defendant's Credibility and Guilt*

Defendant contends the prosecutor committed misconduct by asking Investigator Pina several questions concerning his opinion of the credibility of defendant's statements about the crime and whether or not defendant was guilty of the crimes charged. Of the approximately eight instances of alleged misconduct defendant raises on appeal, he objected at trial to only two. As to the first of these, the trial court sustained defendant's objection to the question and answer concerning Pina's opinions about defendant's display of

emotions during the interviews and struck the answer, thus eliminating any possible prejudice from that alleged instance of misconduct on the part of the prosecutor. As to the second alleged instance of misconduct to which defendant objected, which is the last in time of the eight alleged instances of improper questioning, the trial court overruled defendant's objection to a question concerning Pina's opinion as to defendant's motivation for writing an account of the murder in his manuscript. We see no evidence that objections to the remaining allegedly improper questions would have been futile, nor was this a situation where the prosecutor's alleged misconduct was so pervasive that defendant's failure to object in each instance should be excused. We therefore conclude that defendant forfeited all of his unobjected-to claims of misconduct. In any event, even considering the merits of these two preserved allegations of misconduct in combination with all of defendant's forfeited allegations, no claim would warrant reversal of the judgment.

The questions and answers that defendant challenges can be distilled to two opinions Pina expressed: (1) that defendant's statements to the police and in his manuscript were untruthful attempts to shift blame away from himself; and (2) that defendant, not Hilda Riggs, shot and killed Jamie Bowie in order to rob her. Even assuming these opinions were improperly admitted (see *People v. Melton* (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741] [opinion testimony from a witness with no personal knowledge of the events regarding the veracity of another witness's statements regarding those events is inadmissible because such testimony is speculative]; but see *People v. Padilla* (1995) 11 Cal.4th 891, 946–947 [47 Cal.Rptr.2d 426, 906 P.2d 388] [declining to decide whether this aspect of *Melton* survived Prop. 8]), we nonetheless conclude that any misconduct in this regard was not prejudicial. Investigator Pina's testimony that he believed defendant was guilty as charged and was untruthful when he denied responsibility for the crimes did not present any evidence to the jury that it would not have already inferred from the fact that Pina had investigated the case and that defendant had been charged with the crimes. There was no implication from the questions or answers that Pina's opinions were based upon evidence that had not been presented to the jury. (Cf. *People v. Frye* (1998) 18 Cal.4th 894, 975 [77 Cal.Rptr.2d 25, 959 P.2d 183] ["A prosecutor may not give a personal opinion or belief as to the defendant's guilt if it will suggest to the jury the prosecutor has information bearing on guilt that has not been disclosed at trial."].) In addition, we see nothing in the record that would lead us to conclude that the jury was likely to disregard the instructions it received concerning its duty to decide the issues of credibility and guilt based upon its own assessment of the evidence, not the opinions of any witness. The jury's exposure to the unsurprising opinions of the investigating officer that he believed the person charged with the crimes had committed them, and was untruthful in denying

his guilt, could not have influenced the verdict—especially in light of the overwhelming evidence against defendant. To the extent that there was any misconduct in eliciting these opinions from Investigator Pina, under the state standard there is no likelihood that without the misconduct defendant would have achieved a better result; under the federal standard, the trial was not infected with such unfairness as to result in a denial of due process.

c. *Evidence Concerning and Comment upon Defendant's Lack of Remorse*

Defendant contends the prosecutor committed misconduct by eliciting testimony concerning defendant's failure to demonstrate remorse about Bowie's murder, and then commenting on the absence of remorse during closing argument. We have held that "[u]nless a defendant opens the door to the matter in his or her case-in-chief [citation], his or her remorse is irrelevant at the guilt phase." (*People v. Jones* (1998) 17 Cal.4th 279, 307 [70 Cal.Rptr.2d 793, 949 P.2d 890].) However, the only objection defendant made to any of the testimony was sustained, and the jury was instructed to disregard that answer, which alleviated any possibility of prejudice arising from any misconduct that might have occurred in that instance.[25] Defendant did not object to any part of the prosecutor's closing argument that he now cites as error on appeal. Because objections to the remaining allegedly improper conduct would not have been futile, defendant has forfeited these other challenges. In any event, in light of the overwhelming evidence against defendant, we conclude that even if the prosecutor's references to a lack of remorse on defendant's part were misconduct, neither the fairness nor outcome of the trial was affected to any significant degree.

d. *Assertedly Improper Attempts to Invoke Sympathy for the Victim and Her Family*

Defendant claims the prosecutor committed misconduct by introducing irrelevant evidence designed to evoke sympathy for the victim and her family and friends. As with several of his other claims, in the one instance raised on appeal in which defendant had objected at trial—when the prosecutor read the inscription on Bowie's gravestone—the trial court sustained the objection, an action sufficient to dispel any prejudice from any misconduct that might have occurred. Defendant forfeited his remaining claims by failing to object below. Even if these remaining claims had not been forfeited, we would conclude they are without merit. The question posed to Bowie's father concerning

---

[25] The prosecutor asked Investigator Pina whether he noticed "during the course of these two interviews that we've discussed a pattern or trend when Mr. Riggs would cry or weep?" Pina answered yes, that "[w]hen it's to his advantage to show emotions, he does." After defendant objected, the trial court ordered the answer stricken.

whether he participated in making funeral arrangements, to the extent it might have been irrelevant, was not so likely to evoke sympathy in the jurors that we could conclude the question was misconduct, or even if it was, that any misconduct was prejudicial. The questions asked of Bowie's friend, Victoria Boucher, were relevant for purposes other than evoking sympathy: evidence of the closeness of their relationship and Bowie's wholesome character was relevant to rebut defendant's assertion in his statements to the police that Bowie was a drug courier and to rebut the suggestion by Bessie Hodges that Bowie remained alive after April 16, 1990, but did not contact anyone concerning her whereabouts. There was no misconduct in exploring these areas with the witness.

e. *Assertedly Improper Vouching for the Credibility of Prosecution Witnesses*

Defendant asserts that the prosecutor committed misconduct by questioning prosecution witnesses in a manner that allegedly constituted improper "vouching" for the credibility of prosecution witnesses. "It is misconduct for prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.' [Citation.] Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 336 [60 Cal.Rptr.3d 209, 160 P.3d 84].) Defendant failed to object to the two alleged instances of vouching he raises on appeal and therefore has forfeited these claims.

In any event, no improper vouching occurred.

The question posed to Hilda Riggs regarding when, after initially lying to the police, she decided to "change [her] story and provide the truth," did not suggest the prosecutor was aware of any evidence not before the jury establishing what the "truth" was, as defendant now claims. Hilda had just testified at length concerning what happened to Jamie Bowie, and no juror would have interpreted the use of the word "truth" in the question as a reference to anything other than Hilda's in-court testimony.

Defendant recasts his claim, discussed above, that the prosecutor improperly solicited the opinions of Investigator Pina concerning the credibility of the statements of Hilda and defendant as also constituting improper vouching. As we mentioned above, the questions and answers did not suggest that Pina's opinion was based on any evidence not presented to the jury, nor can we conclude the prosecutor was improperly attempting to invoke the "prestige, reputation, or depth of experience" of the prosecutor, the district

attorney's office, Pina, or the sheriff's department. Moreover, as also discussed above, even if there was misconduct, Pina's opinions concerning defendant's guilt and the credibility of the witnesses were not so significant in the eyes of the jury as to have affected the outcome or fairness of the trial.

### f. Assertedly Improper References to Evidence of Defendant's Character

This contention is essentially the same as the claim discussed above: that the prosecutor improperly introduced and commented upon defendant's lack of remorse and respect for the victim and her family, which defendant here characterizes as improper character evidence. Our disposition of the instant claim is likewise the same: defendant forfeited the claim by failing to object to any of the allegedly improper evidence or comments, and, in any event, in light of the overwhelming evidence against defendant, we cannot conclude that any misconduct in this regard affected the fairness or outcome of the trial.

### g. Assertedly Improper Creation of a "Need" to Introduce BWS (Battered Woman Syndrome) Evidence

Defendant asserts that the prosecutor committed misconduct by improperly creating a "need" for BWS evidence in Hilda's direct examination in order then to call an expert witness on the subject. Defendant forfeited this claim by failing to object on this ground in the trial court. In any event, as discussed above in part II.D.2., there was nothing improper in the admission of the BWS evidence, as such evidence was properly admitted to dispel any misconceptions the jury might have held, regardless of whether or not defendant had explicitly challenged Hilda Riggs's credibility on that particular basis. There was no misconduct in the prosecutor's actions concerning the BWS evidence.

### 5. Assertedly Improper Admission of Photographs of the Victim's Body

Defendant objected when the prosecutor showed the jury various photographs of Bowie's body taken at the crime scene and during the autopsy as being unduly prejudicial under section 352 of the Evidence Code. The prosecutor responded that the photos were relevant to explain the manner of death and the pathologist's testimony concerning the autopsy results. The trial court conducted a hearing, during which it examined the photos. Ultimately, the prosecutor agreed to withdraw some of the photos, the trial court excluded several others, and five photographs to which defendant continued to object were shown to the jury and entered into evidence. Defendant

contends on appeal that the trial court abused its discretion in admitting the five photos at issue because they were excessively gruesome and therefore unduly prejudicial as well as cumulative of other evidence and therefore of minimal probative value. Defendant essentially contends that the possibility of undue prejudice substantially outweighed the probative value of these photographs because the state of Bowie's body was quite disturbing and there was no dispute regarding how she was killed.

As defendant acknowledges, we have rejected similar arguments on numerous occasions. (See, e.g., *Crittenden, supra*, 9 Cal.4th at pp. 134–135, and cases cited therein.) These photographs were admissible to establish that the murder was premeditated and deliberate and to explain and corroborate the testimony of the forensic pathologist. We have reviewed the photographs in question and, while we agree that they are highly unpleasant, we again conclude that the trial court, after conscientiously reviewing the photos and excluding the most disturbing, did not abuse its discretion in admitting the remainder. (*People v. Lewis* (2001) 25 Cal.4th 610, 641 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

To the extent defendant on appeal raises a federal constitutional claim that admission of the photographs violated his right to due process distinct from his claim that the trial court abused its discretion under Evidence Code section 352, he forfeited that claim by failing to raise that independent ground below. (*Partida, supra*, 37 Cal.4th at pp. 437–438.) To the extent defendant's claim is a constitutional gloss on his trial objection and therefore not forfeited, it is without merit because there was no abuse of discretion. (*Prince, supra*, 40 Cal.4th at p. 1229.)

### 6. *Asserted Guilt Phase Instructional Error*

#### a. *Instruction Concerning Defendant's Untimely Disclosure of Alibi Witnesses*

Defendant did not disclose to the prosecution the fact that he intended to present Ina Ross and Minnie Hill as alibi witnesses until June 30, 1994, over one month after the guilt phase of the trial had commenced, three weeks after the prosecution had completed its guilt phase case-in-chief, and only five days before these witnesses testified. After Ross's testimony and before Hill's, the prosecutor requested a hearing outside the presence of the jury concerning defendant's failure to disclose these witnesses in a timely manner. The prosecutor requested sanctions for the late disclosure, arguing that if the alibi evidence were true, defendant obviously knew of these witnesses years before the trial but had never included them on a witness list (or otherwise indicated that he had an alibi). Defendant stated at the hearing that he had not

disclosed the witnesses because they had moved and he had only recently learned where they were residing. The court declined to exclude the witnesses' testimony as a sanction but stated it would entertain requests from the prosecution for a continuance to prepare for cross-examination and for a jury instruction concerning the apparent discovery violation.

The prosecutor did not request a continuance but did submit a proposed instruction for the jury regarding the late disclosure. Defendant objected to the giving of the instruction. The trial court, after finding that defendant had committed a discovery violation under section 1054.7 by failing, without good cause, to disclose these witnesses 30 days prior to trial, gave a modified version of the proposed instruction as part of the guilt phase jury instructions, as follows: "California Penal Code Section 1054.7 requires that each side in a criminal action provide names and addresses of witnesses that it expects to call at trial at least 30 days prior to the trial unless good cause is shown for this not to be done. [¶] There has been evidence presented to you from which you may find that there was a failure by the defense to provide timely notice to the prosecution of the names and addresses of witnesses Ina Ross and Minny [*sic*] Jean Hill. [¶] You may consider such failure, if any, in determining the weight to be given to the testimony of such witnesses. The weight to be given such failure is entirely a matter for the jury's determination."

On appeal, defendant contends that giving this instruction to the jury was error and violated various of his constitutional rights because it unfairly punished the defense for a "procedural irregularity" and failed to provide adequate guidance to the jury in how it should consider the discovery violation in its deliberations.

██ Section 1054.3, subdivision (a), requires in part that the defendant (and his or her attorney) disclose to the prosecution the "names and addresses of persons, other than the defendant, he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons . . . ." The requirement that the defense timely disclose persons whom it "intends to call as witnesses at trial" applies to " 'all witnesses it reasonably anticipates it is likely to call.' " (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 376, fn. 11 [285 Cal.Rptr. 231, 815 P.2d 304] (*Izazaga*).) In addition, section 1054.7 provides in relevant part that the disclosure of witness names and addresses must "be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred. 'Good cause' is limited to threats or possible danger to the safety of a victim

or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement." Finally, section 1054.5, subdivision (b), provides in part that "Upon a showing that a party [here, the defense] has not complied with Section . . . 1054.3 and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure."

Defendant does not contend that the trial court erred by finding that he had violated the disclosure requirement, and we conclude that substantial evidence supports the trial court's decision. The trial court could reasonably find that defendant, charged with capital murder, would reasonably anticipate that it was likely he would call as witnesses family members who purportedly knew that he was several hundred miles away from the scene of the crime when the murder was committed. The discovery statute requires disclosure of the *names* of intended witnesses; thus, even if it were true that defendant had only recently ascertained the *addresses* of Ross and Hill, the trial court could reasonably find that defendant should have disclosed their names at least 30 days before the trial began. Finally, defendant did not make any showing of "good cause" as defined by the statute for deferring disclosure, e.g., that disclosure of the witnesses' names raised concern about the witnesses' safety or the loss of evidence; he merely asserted in his unsworn statements to the court that he had not been able to locate his own sister and niece in the years since he had been arrested because they had moved at some point in time. Accordingly, the trial court did not err in finding that defendant had violated the discovery statutes.

Defendant's appellate challenge to the trial court's decision is focused, instead, on the propriety of its choice of remedy for the violation—giving the special instruction to the jury. Our examination of the instruction as given in the present case, as well as the circumstances of this trial, convinces us that there was no error, and in any event, if there were error, it was harmless under any standard.

As defendant observes, the trial court's instruction is similar to a later-created standard instruction, CALJIC No. 2.28, which has been the subject of significant criticism in the Courts of Appeal. (See *People v. Bell* (2004) 118 Cal.App.4th 249 [12 Cal.Rptr.3d 808] (*Bell*); see also *People v. Lawson* (2005) 131 Cal.App.4th 1242 [32 Cal.Rptr.3d 634]; *People v. Saucedo* (2004) 121 Cal.App.4th 937 [17 Cal.Rptr.3d 692] (*Saucedo*); *People v. Cabral* (2004) 121

Cal.App.4th 748 [17 Cal.Rptr.3d 456].) CALJIC No. 2.28 was subsequently revised to address these concerns to some degree,[26] and the newly adopted Judicial Council of California Criminal Jury Instructions (2007–2008) include an extensively revised instruction on this subject, CALCRIM No. 306. Because of the particular circumstances of the present case, we need not (and do not) address the propriety of either CALJIC No. 2.28 or CALCRIM No. 306; we discuss those instructions only as they relate to the propriety of the instruction given in this case.

Two of the concerns regarding the original version of CALJIC No. 2.28 expressed in *Bell* are that the instruction allowed the jury to draw an adverse inference against the defendant based on a violation of the discovery statute committed solely by his attorneys, and, moreover, that it permitted the jury to draw from the discovery violation (as to which the defendant might be blameless) an adverse inference regarding defendant's consciousness of guilt, without also informing the jury that the violation itself was not sufficient to prove guilt. Neither of these circumstances is present here. First, defendant represented himself, starting with the preliminary hearing years before trial, and any discovery violation therefore was his responsibility, not an error of counsel. (Cf. *Bell, supra,* 118 Cal.App.4th at p. 255 [noting that "[i]t was misleading to suggest that 'the defendant' bore any responsibility for the failed compliance"].) Second, the instruction given by the trial court limited the inferences the jury could draw by expressly directing the jury that it could consider a discovery violation in assessing the weight of the alibi testimony. In this latter regard, the trial court's instruction in the present case is congruent with the new CALCRIM No. 306, which provides in part, "In evaluating the weight and significance of [the untimely disclosed] evidence, you may consider the effect, if any, of that late disclosure." Therefore, we do not believe, as defendant argues, that the trial court erred by not directing the jury that evidence of the discovery violation was insufficient to prove his guilt, because the instruction given in this case, unlike that in *Bell,* did not

---

[26] The earlier version of CALJIC No. 2.28 is set forth in *Bell* as follows: " 'The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of truth, save court time and avoid any surprise which may arise during the course of the trial. Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence. [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the Defendant failed to timely disclose the following evidence: . . . [¶] Although the Defendant's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. [¶] The weight and significance of any delayed disclosure are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence.' " (*Bell, supra,* 118 Cal.App.4th at p. 254.)

permit any direct inference leading from the discovery violation to defendant's guilt. (Cf. *Bell, supra,* 118 Cal.App.4th at p. 256 [in the absence of limitations on the inferences the jury could draw from the discovery violation, "the jurors may have concluded they were free to find Bell guilty merely because he failed to comply with the discovery statute"].)

Another important concern voiced in *Bell* is that the instruction given in that case did not provide explicit guidance to the jury regarding why and how the discovery violation would be relevant to its deliberations. In the Court of Appeal's view, the instruction was faulty because, while it informed the jury "that tardy disclosure might deprive an opponent of the chance to subpoena witnesses or marshal evidence in rebuttal, there was no evidence that such an eventuality transpired here." (*Bell, supra,* 118 Cal.App.4th at p. 255.) As the court stated, "if there were no diminution of the People's right to subpoena witnesses or present rebuttal, it is unclear how the jurors were to evaluate the weight of the potentially affected testimony. Certainly, in the absence of any practical impact on the factfinding process, the only sphere of jury responsibility here, the jurors were not free to somehow fashion a punishment to be imposed on Bell because his lawyer did not play by the rules." (*Ibid.*) Defendant observes that, as in *Bell,* there was no evidence in the present case that the prosecution's opportunity to rebut the alibi witnesses was negatively affected by the late disclosure. This circumstance, however, does not lead us to conclude there was error in defendant's case.

■ We do not read *Bell* as holding that the sole basis for giving an instruction regarding a discovery violation is an actual effect on the other party's ability to respond to the evidence, and we reject defendant's contention, to the extent he has raised it, that a trial court's decision whether to give an instruction on this subject must be restricted in such a manner. Were a jury to find a defendant had failed to disclose evidence to the prosecution in an attempt to hide the evidence until the last minute, the jury could reasonably infer from the fact that the defendant thereby violated his or her duty under the discovery statutes that even the defense did not have much confidence in the ability of its own evidence to withstand full adversarial testing. Whether or not the prosecution was actually impaired by the attempt to conceal the evidence would not change the circumstance that defendant tried to inhibit the prosecution's efforts. In other words, while not constituting evidence of the defendant's consciousness of his or her own guilt, the fact of a discovery violation might properly be viewed by the jury as evidence of the defendant's consciousness of the lack of credibility of the evidence that has been presented on his or her behalf.[27] In *Bell,* the trial court had found that no attempt to gain a tactical advantage was behind the failure to timely disclose

---

[27] Of course, the jury may properly be instructed, in addition, that a defendant's effort to fabricate evidence may be indicative of the defendant's consciousness of guilt but is not by

the evidence at issue, so that inference was factually unavailable in that case. (*Bell, supra,* 118 Cal.App.4th at p. 254.) No such finding was made in the present case, and the trial court therefore did not err by giving the instruction, despite there being no indication that the prosecution was actually affected by the late disclosure.

Defendant challenges the instruction given in the present case also because it informed the jury that it "may find" a discovery violation occurred, but did not provide guidance as to how it was to make that determination. Defendant forfeited a challenge to the completeness of the instruction by failing to request clarifying or amplifying language. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [44 Cal.Rptr.3d 632, 136 P.3d 168] [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' "].) In any event, any shortcoming in this regard was beneficial to defendant, and, therefore, if error occurred, it was harmless under any standard.

We observe first that the instruction at issue in *Bell* (as well as the current CALJIC No. 2.28 and CALCRIM No. 306) informed the jury that a discovery violation *had occurred.* The trial court in the present case expressly rejected the prosecution's suggestion to instruct the jury along those lines, stating that, in its view, "the Court needs to make a threshold ruling that there is evidence from which the jury might find that there was a failure, just as the Court needs to find that a confession was voluntary, and then the jury rules on that issue again." By providing that the jury "may find" a violation, the instruction in this case afforded defendant a "second bite at the apple," to which he might not have been legally entitled.[28]

In addition, because the jury was not instructed with the full text of section 1054.7, including the definition of "good cause," the defense was able to make arguments to the jury that likely would not have satisfied that standard, or at least likely would have been disputed by the prosecution, had the trial court given a more complete instruction.[29] For these reasons, the lack of a

---

itself sufficient to prove guilt. (See CALJIC No. 2.04; CALCRIM No. 371; *People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

[28] We express no view regarding whether a defendant actually is or is not entitled to have the jury revisit the question whether a discovery violation occurred.

[29] Defendant's advisory counsel, who presented the closing argument to the jury, stated, "You've gotten testimony in court to the effect that Miss Ross and Miss Hill both had moved. [¶] You've gotten testimony to the extent that the defense didn't know where they were located. And so you're left with the determination, a jury determination, of whether there was good cause for not revealing the names and addresses of these witnesses to the prosecution." Delayed disclosure of *both* the name and address of a witness due to an inability to locate him or her is not good cause as defined in section 1054.7 (" 'Good cause' is limited to threats or

more complete instruction to the jury regarding how to determine whether a discovery violation occurred in no way could have prejudiced defendant in this case.

Finally, defendant contends that the instruction violated his state and federal constitutional rights to a fair and reliable trial. He is mistaken. The fact that defendant failed to comply with his obligations under the discovery statutes by presenting these surprise alibi witnesses near the end of the trial was relevant evidence the jury could consider in assessing the credibility of their testimony. The trial court was authorized by statute to "advise" the jury of this fact (§ 1054.5, subd. (b)), and its instruction to that effect properly explained that it was for the jury to determine what, if any, weight and significance the discovery violation carried in resolving the credibility of the alibi testimony. The trial court, in fact, proceeded even more deferentially by directing that it was for the jury to determine in the first instance whether a discovery violation occurred. The instruction was not a statement of "judicially sanctioned doubt," as defendant contends, but rather a proper statement

possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement."). The prosecutor's argument in response challenged only the factual assertion that the defense did not know where the witnesses were, reinforcing the mistaken notion that a mere lack of knowledge of their whereabouts, if true, could constitute good cause for not disclosing their names.

Counsel also argued, essentially, that defendant was not required to disclose the names at all, stating, "The law requires you to hand over those names and addresses if you expect to call the witness at trial. If you don't know where they are, how are you going to call them?" The notion that defendant did not *intend* for purposes of discovery to call these critical witnesses, who might have established his absolute innocence, because defendant was not sure that he would be *able* to call them at trial, arguably conflicts with our prior interpretations of the statute, a point that might have been made to the jury had a more complete instruction been given. (See *Izazaga, supra,* 54 Cal.3d at p. 376, fn. 11 [the discovery statutes require disclosure of " 'all witnesses [a party] reasonably anticipates it is likely to call' "]; see also *In re Littlefield* (1993) 5 Cal.4th 122, 131 [19 Cal.Rptr.2d 248, 851 P.2d 42] ["Allowing the defense to refrain deliberately from learning the address or whereabouts of a prospective witness, and thus to furnish to the prosecution nothing more than the name of such a witness, would defeat the objectives of the voters who enacted section 1054.3 . . . ."]; *People v. Tillis* (1998) 18 Cal.4th 284, 290 [75 Cal.Rptr.2d 447, 956 P.2d 409] [declining to decide whether determination of a party's asserted intent to call a witness involves an objective or subjective evaluation of the facts].)

Finally, counsel argued that defendant might have withheld the witnesses' names due to the alleged harassment of and threats to other witnesses by the prosecution's investigator. This argument would appear to fall within the statutory definition of good cause, although the statute seems to contemplate that the parties would not engage in self-help in this manner, but rather would timely seek permission from the trial court to defer disclosure. (See § 1054.7 [permitting the parties to seek in camera review of a request for a finding of good cause for the denial or regulation of disclosures]; *In re Littlefield, supra,* 5 Cal.4th at p. 136 ["if a party seeks to withhold disclosure of the address or whereabouts of a prospective witness because of 'threats or possible danger to the safety of a victim or witness, [or] possible loss or destruction of evidence . . .' (§ 1054.7), that party may request leave to make an in camera showing of good cause as to why disclosure should be denied, restricted, or deferred"].)

of the applicable law, from which the parties could argue inferences that might (or might not) be drawn from the evidence presented at trial. We discern no unfairness in these circumstances that could have operated to make defendant's trial fundamentally unfair.

Even were we to conclude that the giving of this instruction in the present case was error under state law, or deprived defendant of his federal constitutional rights, we would conclude there is no reasonable probability that an outcome more beneficial to him would have been achieved in the absence of the instruction (see *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) and that any federal constitutional error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]).

The evidence indicating that defendant murdered Jamie Bowie, or at least was aware of and took part in the plan to rob her and was present when she was killed, was entirely overwhelming, especially in comparison to the exceedingly dubious alibi testimony provided by defendant's family members. (Cf. *Bell, supra,* 118 Cal.App.4th at p. 257 [noting that "[t]he prosecution's case was not overwhelming," and included no physical evidence tying defendant to the scene or the victim, or statements by defendant concerning the crime].) Moreover, reliance on the instruction regarding the discovery violation was but a small part of the prosecution's devastating arguments concerning the credibility of the alibi testimony. (See *Saucedo, supra,* 121 Cal.App.4th at p. 944 [error in giving CALJIC No. 2.28 was harmless because "[w]hether or not CALJIC No. 2.28 had been given, [defendant's] last-minute alibi and his witnesses were a credibility gold mine for the prosecution"].) It was not the instruction that made the alibi defense implausible but its inexplicable materialization two and one-half years after defendant's arrest and one month after the trial had begun. Indeed, "[n]ot only did [defendant's] alibi suddenly surface—like Botticelli's Venus emerging fully formed from the sea—but it also appeared with two family member witnesses telling an identical story, and no one satisfactorily explained the failure to come forward with this exculpatory evidence sooner." (*Saucedo, supra,* 121 Cal.App.4th at p. 944.) In sum, there is no reasonable possibility or probability that the challenged instruction, even if erroneous, affected the outcome or fairness of defendant's trial.

### b. *Denial of Request for Instruction That Hilda Riggs Was an Accomplice as a Matter of Law*

The trial court gave the jury several standard instructions concerning the receipt and credibility of accomplice testimony: CALJIC Nos. 3.10, 3.11,

3.12, 3.14, and 3.18.[30] The court denied, however, defendant's request to instruct the jury that Hilda Riggs was an accomplice as a matter of law pursuant to CALJIC No. 3.16, and instead instructed the jury, pursuant to CALJIC No. 3.19, that defendant bore the burden of proving that Hilda was an accomplice. Defendant contends on appeal that the trial court erred in this regard and the error violated his right to due process. Defendant is mistaken.

At first blush, the trial court's decision not to instruct the jury that Hilda was an accomplice as a matter of law might seem puzzling. She had, of course, already pleaded guilty to the first degree murder of Bowie and had been sentenced to serve 25 years to life in prison for the crime. The trial court, however, was concerned that if it instructed the jury in this case that Hilda was an accomplice as a matter of law, the jury might interpret such an instruction as foreclosing defendant's alibi defense, which placed both defendant *and Hilda* in Stockton on the day of the murder. The defense attempted to skirt this factual conundrum by requesting that the trial court modify the instruction to direct the jury that if it found Hilda was a witness to the crimes, she was also an accomplice, but the court rejected that approach, citing the Use Note to CALJIC No. 3.16, which provided that if the question of the witness being an accomplice involves disputed facts or different inferences, the jury must decide the issue. On appeal, defendant raises a slightly different argument than the one he made below. Rather than contending that the trial court should have modified the instruction in the manner suggested at trial, he now contends the court erred because, he argues, it was undisputed that Hilda was a participant in the murder, and the only factual dispute at issue concerned defendant's role in the murder. Assuming we may review this claim, we find it to be without merit.

■ Section 1111 defines an accomplice as a person "who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." " 'Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury "unless the evidence permits only a single inference." [Citation.] Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are "clear and undisputed." ' " (*People v. Brown* (2003) 31 Cal.4th 518, 556–557 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

Defendant's claim that Hilda's status as an accomplice was undisputed is incorrect. The alibi witnesses placed defendant *and* Hilda in Stockton on the

___

[30] To summarize, these instructions defined the term "accomplice," explained that accomplice testimony must be corroborated before it may be considered by the jury, defined the required corroboration, and directed that accomplice testimony should generally be viewed with distrust.

day of the murder, hundreds of miles away from where Bowie had been seen at various times of the day in the company of an African-American couple. While it is true that defendant argued it was possible Hilda had left Stockton without him on April 16, 1990 (although no actual evidence supported this argument), and while it certainly would be highly irregular for Hilda to have pleaded guilty to the murder when she was in fact uninvolved, for the trial court to have instructed the jury she *was* in Indio when Bowie was killed *as a matter of law* would have constituted a finding of fact on an issue that was for the jury to decide. (*People v. Brown, supra,* 31 Cal.4th at p. 557; cf. *People v. Hill* (1967) 66 Cal.2d 536, 555 [58 Cal.Rptr. 340, 426 P.2d 908] [the accomplice "was charged with the identical crimes, and all the evidence placed him in the company of [the defendants] in the commission of those crimes"].) Under these circumstances, the trial court properly declined to give CALJIC No. 3.16, which the jury might have interpreted as indicating the court's opinion of the credibility of defendant's alibi witnesses.

Moreover, even were we to conclude that the trial court had erred, defendant could not have been prejudiced. There was extensive corroboration of Hilda's testimony, including defendant's own statements to the police, rendering any inadequacy in the accomplice instructions harmless. (*People v. Brown, supra,* 31 Cal.4th at p. 557.) In addition, in the present case there is no realistic possibility that the jury could have believed Hilda's testimony that she participated in the robbery and murder of Bowie (and therefore her testimony that defendant was there as well) and not have found her to be an accomplice.

c. *Failure to Instruct Jury to Unanimously Agree on a Theory of First Degree Murder*

Defendant contends the trial court erred by not instructing the jury that it must unanimously agree on the theory of first degree murder—either felony murder or premeditated and deliberate murder—in order to reach a verdict on that charge. As defendant recognizes, however, we have rejected this claim on numerous prior occasions, and do so in the present case as well. (See *People v. Benavides* (2005) 35 Cal.4th 69, 100–101 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Nakahara* (2003) 30 Cal.4th 705, 712–713 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) Moreover, the jury's findings of robbery and the truth of the robbery-murder special circumstance signify unanimous agreement with a first degree felony-murder theory. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1185 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

### d. *Assertedly Improper Instruction Concerning Motive*

Without objection by defendant, the trial court instructed the jury with the standard instruction concerning motive evidence, CALJIC No. 2.51.[31] On appeal, defendant contends this constituted reversible error, violating his rights to due process and a fair trial in three ways: it allowed the jury to convict him based solely on proof of motive; it shifted the burden of proof to the defense to prove innocence; and it lessened the prosecution's burden of proof on the robbery-murder special-circumstance allegation. We have rejected similar claims in prior decisions. Although defendant alleges in summary fashion that the present case is distinguishable on its facts because the prosecution's theory of the case here "relied on motive," we discern no distinction of significance and conclude that our prior decisions are controlling.

CALJIC No. 2.51 does not impermissibly allow the jury to find guilt based upon evidence of motive alone, despite the absence of an explicit statement to that effect. (*People v. Jurado* (2006) 38 Cal.4th 72, 124–125 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Snow* (2003) 30 Cal.4th 43, 98 [132 Cal.Rptr.2d 271, 65 P.3d 749] (*Snow*) ["the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of murder"].) Nor does it improperly shift the burden to the defense to prove innocence. (*People v. Prieto* (2003) 30 Cal.4th 226, 254 [133 Cal.Rptr.2d 18, 66 P.3d 1123] ["no reasonable juror would misconstrue CALJIC No. 2.51 as 'a standard of proof instruction apart from the reasonable doubt standard set forth clearly in CALJIC No. 2.90' "].) Finally, the instruction, which states that motive is not an element of the "crime charged," does not conflict with the special circumstance instruction in such a manner that there is any reasonable likelihood that the jury would have been confused, and would have improperly decided the truth of the special circumstance allegation. (*People v. Crew* (2003) 31 Cal.4th 822, 852 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Noguera* (1992) 4 Cal.4th 599, 637 [15 Cal.Rptr.2d 400, 842 P.2d 1160] [rejecting similar claim concerning financial gain special circumstance "on the commonsense ground that . . . the ' "crime charged" was murder and any reasonable juror would have understood the instruction as referring to this substantive offense only and not to any special circumstance allegation' "].)

---

[31] The trial court stated, "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give [its] presence or absence, as the case may be, the weight to which you find it to be entitled."

e. *Assertedly Improper Instructions That "Diluted" the Reasonable Doubt Standard*

Defendant raises a familiar claim that several of the standard instructions given in the present case individually and cumulatively "diluted" the meaning of the reasonable doubt standard, and that this error violated various of his constitutional rights.[32] We recently rejected the same challenges in *People v. Rogers* (2006) 39 Cal.4th 826, 888–889 [48 Cal.Rptr.3d 1, 141 P.3d 135], and do so again here. Defendant also contends the instructions cumulatively undermined the prosecution's burden of proof. Not so. (*Id.* at p. 889.)

E. *Penalty Phase Claims*

1. *Asserted Prosecutorial Misconduct*

Under California law, a prosecutor commits reversible misconduct during the penalty phase if he or she makes use of "deceptive or reprehensible methods" in attempting to persuade either the trial court or the jury, and there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1019 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Under the federal Constitution, unless the prosecutor's actions result in the denial of a specific constitutional right—such as improper comment upon the defendant's invocation of the right to remain silent—conduct otherwise worthy of condemnation is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Wainwright, supra*, 477 U.S. at p. 181.) A claim of prosecutorial misconduct is not preserved for appeal unless defendant objected in the trial court and requested an admonition be given to the jury. (*Stanley, supra*, 39 Cal.4th at p. 952.)

Defendant first contends the prosecutor's alleged misconduct committed during the guilt phase affected the fairness and outcome of the penalty phase of the trial as well. We have concluded that none of defendant's claims of prejudicial guilt phase misconduct, even assuming they properly are raised on appeal, has merit, and therefore reject the claim that the penalty phase was tainted by earlier misconduct.

As with his claims of guilt phase misconduct, defendant failed to object and request admonitions in the majority of instances of alleged misconduct he

---

[32] Defendant cites the following instructions as the cause of this asserted error: a modified instruction combining CALJIC Nos. 2.01 and 8.83 (sufficiency of circumstantial evidence to prove guilt of offenses and truth of special circumstances); CALJIC No. 2.21.1 (discrepancies in testimony); CALJIC No. 2.21.2 (willfully false witnesses); CALJIC No. 2.22 (weighing of conflicting testimony); CALJIC No. 2.27 (sufficiency of evidence of one witness); and CALJIC No. 2.51 (motive).

now raises on appeal. We reject defendant's contention that the prosecutor committed pervasive misconduct during the penalty phase that excuses defendant's failure to preserve his claims. As demonstrated below, we also reject his contention that any misconduct, whether considered individually or as whole, warrants reversal of the penalty judgment.

a. *Introduction of Facts Underlying Nonviolent Conviction Under Factor (c)*

Without objection from the defense, the prosecutor questioned two witnesses concerning the facts leading to one of defendant's Texas burglary convictions. As the trial court later recognized, it was error to allow admission of this testimony under section 190.3, factor (c), to the extent that it went beyond establishing the fact of the conviction because there was no evidence the crime involved force or violence. (*People v. Livaditis* (1992) 2 Cal.4th 759, 776 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Despite defendant's failure to object to this testimony, the trial court sought to remedy this error by instructing the jury at the close of the penalty phase that it was not permitted to consider the underlying facts of the burglary as evidence in aggravation. Defendant's appellate claim that the presentation of this testimony constituted prosecutorial misconduct was forfeited by his failure to object. In any event, any misconduct was harmless, given that the facts of the burglary were not especially prejudicial and our assumption the jury followed the trial court's admonition to disregard the testimony. (*Jones, supra*, 15 Cal.4th at p. 168.)

b. *Asserted Violations of* Griffin v. California *and* Doyle v. Ohio

Defendant testified at the penalty phase and attempted to create doubt about his guilt by testifying that Hilda and a man named Robert Beverly murdered Jamie Bowie. On cross-examination, the prosecutor asked two questions defendant now contends constituted misconduct because they commented improperly on defendant's exercise of his Fifth Amendment right to remain silent.[33] Defendant did not object and request an admonition on either occasion, and therefore has forfeited these claims. In any event, and even if we were to assume the questions were misconduct as defendant contends and

[33] Defendant contends one question by the prosecutor—"Why didn't you tell the police the very first time you had a chance, Robert Beverly did it or was there?"—constituted a comment on his invocation of his *Miranda* rights at the first police interview, in violation of *Doyle, supra*, 426 U.S. at page 618. He also contends another question by the prosecutor—"Why has not this jury, until today, heard about Robert Beverly and his involvement in this crime?"—constituted a comment on defendant's failure to testify at the guilt phase of the trial, in violation of *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 85 S.Ct. 1229].

not legitimate comment on the very different account of the murder defendant had provided after his arrest (but see *Anderson v. Charles* (1980) 447 U.S. 404, 408 [65 L.Ed.2d 222, 100 S.Ct. 2180]), any such misconduct was harmless beyond a reasonable doubt. The evidence of defendant's guilt was overwhelming, defendant's alibi witnesses were thoroughly discredited, and defendant's fanciful testimony concerning Robert Beverly's participation in the murder was refuted by Beverly's testimony during the prosecution's penalty phase rebuttal case, in which he stated that he had never met defendant, Hilda Riggs, or Jamie Bowie; that he did not participate in her murder; and that he was at work on a naval base on the day she disappeared, which could be confirmed by military records. The prosecutor's remarks, to the extent they were misconduct and not merely comments on the inconsistencies of the various accounts defendant had provided, did not influence the jury's verdict or otherwise make the trial fundamentally unfair.

c. *Assertedly Improper Questions Suggesting Nonstatutory Aggravating Factors*

Defendant points next to several instances when, in his view, the prosecutor asked questions of witnesses that sought improperly to introduce evidence that was not relevant to any statutory aggravating factor under section 190.3. On several of these occasions defendant objected and the trial court sustained the objection (or the trial court interposed its own objection), thereby alleviating any possible prejudice that might have resulted from any misconduct.[34] The remainder of defendant's claims were not preserved for appeal and, in any event, are without merit.

Defendant contends the prosecutor committed misconduct by asking the probation officer who prepared the presentence report for defendant's statutory rape conviction whether defendant originally had been charged with forcible rape. He argues that this question sought to introduce irrelevant evidence; that it constituted improper vouching for prosecution witness Cecelia G., who recounted her kidnapping and rape ordeal; and that it violated defendant's constitutional right to confrontation to the extent it called for hearsay. Defendant did not object to the prosecutor's question (or the probation officer's answer) or request an admonition, nor would it have been futile to do so. He therefore has forfeited these claims. Even had they been preserved, defendant was not prejudiced thereby, given that Cecelia's testimony, if found credible by the jury, established that defendant had forcibly

---

[34] The trial court interposed its own objection when the prosecutor asked Lena Swindle "[w]hat kind of husband" defendant was; defendant's objection was sustained when the prosecutor asked defendant why he was offering "evidence of [his] past life experiences"; and the trial court sustained defendant's objections and admonished the jury to disregard the questions and answers when the prosecutor asked defendant two questions about his view of the appropriate penalty.

raped her and pleaded guilty to criminal culpability for those actions; a single question inquiring into the nature of the original charge, a charge that was not sustained in any event, could not have added any significant weight to Cecelia's testimony.

Defendant next challenges the prosecutor's cross-examination of defendant, during which the subject of defendant's participation in a car theft organization was explored. Defendant did not object at trial, and his challenge is therefore forfeited. In any event, there was no misconduct because defendant had testified about his role in the car theft ring on direct examination, and the prosecutor was therefore permitted to explore this subject on cross-examination.

The only instance in which defendant objected to a question by the prosecutor and the objection was overruled occurred when defendant was asked whether he thought it was "important for us to consider your childhood." Defendant contends on appeal that this constituted misconduct on the prosecutor's part because the question improperly called on defendant to speculate regarding the reason advisory counsel had questioned defendant and other witnesses about defendant's background. We disagree. To the contrary, the question was a fair attempt to elicit, from presumably the most knowledgeable witness, an opinion about whether and how defendant's childhood had affected his development as an adult in a way that might constitute mitigating evidence. For this reason, the question was not the same, as defendant argues, as asking a prosecution witness "why the witness thought it was important to give testimony about [the defendant's] prior acts of violence."

### d. *Assertedly Improper Questions of Defendant Concerning Credibility of Other Witnesses*

Defendant challenges on appeal several questions the prosecutor asked him during cross-examination as to whether defendant thought his former wives and girlfriends were lying when they testified about the abuse he inflicted upon them, and why they would do so. Defendant objected to some of the questions, but the objections were overruled. Assuming defendant's appellate claims were preserved, we conclude they are without merit because there was no misconduct. Although it is true that to ask one witness for an opinion regarding other witnesses' credibility may be improper, in that such "were they lying" questions might merely call for speculation from that witness, in the present case, defendant, who had personal knowledge of whether he abused these women in the manner to which they testified, opened the door to the prosecutor's questions by testifying in his direct examination that these witnesses were untruthful. (See *People v. Chatman* (2006) 38 Cal.4th 344, 382–383 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

e. *Assertedly Improper Questions Appealing to Jurors'*
*Fear*

On direct examination, advisory counsel asked defendant several questions as to how a death sentence might affect defendant's family. Defendant's response included a statement that he considered members of the "Cryps" (*sic*) and "Bloods" gangs, who were "watching this trial," to be part of his family. Defendant added that if he were sentenced to death, "it would cause a very negative reaction with the youngsters." On cross-examination, the prosecutor asked defendant about his statement that gang members were watching the trial, and defendant said they were watching it "[v]ery closely." In response, the prosecutor asked, "Okay, very closely. And when you said that, I had images of a Los Angeles riot coming to mind. Is that what you meant by that threat, sir?" Defendant answered, "No." The prosecutor asked defendant, "You wouldn't want to threaten this jury or this system by anything outside of the evidence, now, would you?" Defendant responded, "Even though I have denounced this system for its injustice, I would not threaten anyone. I don't make threats." The prosecutor countered by asking whether defendant's comment to the defense psychologist, Dr. Leitman, concerning defendant's difficulty in not attacking the prosecutor during trial was a threat.[35] Defendant again answered, "No."[36]

The prosecutor also asked two correctional officers, who testified for the defense concerning the level of risk defendant posed while incarcerated, whether they would be willing to allow defendant to reside in their homes. The trial court sustained defendant's objection to the question to one of the witnesses but overruled the objection to the other.

On appeal, defendant contends the prosecutor, through these questions, improperly sought to instill fear in the jury in order to prejudice defendant. Defendant forfeited his challenges to some of these questions by failing to object. In any event, we see no prejudicial misconduct. The questions regarding whether defendant intended to threaten the jury by testifying that criminal gangs were "very closely" watching the trial were appropriate to clarify defendant's own (potentially threatening) testimony and to impeach his testimony that he never made threats. Similarly, the questions to the correctional officers were colorful attempts to impeach their testimony that

[35] The prosecutor asked, "Didn't you tell Dr. Leitman that you get along pretty well with people but to sit in that courtroom for five months and not attack [the prosecutor], that that was how you got along in this courtroom? That—that's not threat to you?"

[36] Defendant also gave a long, nonresponsive answer accusing the prosecutor of various improprieties and of "doing anything to win a case" and explaining that defendant had not become "personally involved" or "angry" with the prosecutor because defendant was a Christian. The trial court struck that portion of the answer after the prosecutor objected.

defendant was a minimal security risk. Even if we were to conclude that the questions were misconduct, any misconduct was harmless when these isolated instances are considered in the context of the entire penalty phase of the trial.

### f. *Assertedly Improper Questions Confusing Defendant's Roles as Witness and Counsel*

Defendant contends the prosecutor committed misconduct by asking him questions during cross-examination that concerned defendant's role as his own attorney, rather than his role as a witness.[37] As defendant concedes, the trial court sustained defense objections to both of these questions. Accordingly, to the extent there was misconduct, there was no prejudice to the fairness or outcome of the proceedings.

### g. *Assertedly Improper Questions That Were Irrelevant, Argumentative, Inflammatory, or Based upon Facts Not in Evidence*

Other than the claims discussed above, defendant raises numerous other challenges to the questions posed by the prosecutor to several witnesses, including defendant, as being irrelevant, argumentative, inflammatory or based upon facts not in evidence. Defendant did not object to the majority of these questions, thereby forfeiting his appellate challenges to them. In any event, even if we were to review the merits of those claims, and further assume the questions were improper, we would conclude there is no reasonable possibility that defendant was prejudiced by the prosecutor's questions, which, though sometimes strongly worded, were not evidence, and the jury was so instructed. In those instances when defendant did object to a question, the objection was sustained, or the prosecutor withdrew the question, and any possible misconduct was therefore harmless.

### h. *Assertedly Improper Closing Argument*

Defendant raises a number of challenges to portions of the prosecutor's closing arguments as constituting misconduct.[38] First, he contends the prosecutor improperly argued that defendant's general background and personal

---

[37] The prosecutor asked whether a particular witness "might be an important witness in your defense" and whether, in defendant's opening statement, defendant had "told us, sir, that you were going to start from the beginning of that manuscript and let us know everything that was in that manuscript, right?"

[38] When defendant's advisory counsel raised the first defense objection during the prosecutor's arguments, counsel stated he was "saving most of my objections for afterwards in an effort not to interrupt the flow of the District Attorney's closing arguments." The prosecutor voiced no objection to this suggestion, and the defense subsequently raised five objections and

history could be considered evidence in aggravation. In discussing mitigating evidence under the catchall provision of section 190.3, factor (k), the prosecutor argued that if the jury determined that items of mitigating evidence "make up for [defendant's] past life, and is a reason to spare him the death penalty, you're free to accept that position." After the defense objected,[39] the trial court advised the prosecutor that the reference to "making up for defendant's past" was potentially misleading, because only specific areas of defendant's past conduct could be considered in aggravation (that is, the circumstances of the crimes of conviction and his prior violent criminal conduct and felony convictions). The prosecutor then clarified for the jury that only those three aspects of defendant's past could be considered as evidence in aggravation and that any other aspects of defendant's "life history" could be considered by the jury only as mitigating evidence. There was no misconduct: the prosecutor used somewhat imprecise language about defendant's past in the earlier statements and then properly clarified his intended meaning when the error was called to his attention. Moreover, due to the clarification, there is no reasonable possibility the jury misconstrued the remarks.

■ Defendant next challenges the prosecutor's argument that the jury could consider the scope of the investigation of Bowie's murder as evidence in aggravation. The prosecutor mentioned the "large scale search operations," the delay in identifying the murderer due to defendant's flight, the difficulty in identifying Bowie's remains after they were discovered, and the many law enforcement agencies that had been involved with the case, summarizing this evidence as showing the present case was "extraordinary" compared to a "typical murder investigation." Defendant later objected to this argument on the ground that the manner in which the investigation of a murder progresses does not reflect on the defendant's culpability or the severity or gravity of the crime. On appeal, defendant also argues that the prosecutor's statement was improper because it was not based upon the evidence adduced at trial, as there was no testimony concerning what a "typical" murder investigation entails. This latter ground has been forfeited because it was not raised below. In any event, there was no misconduct in the prosecutor's making these observations. Although the prosecutor did not fully explain the relevance of the difficulties law enforcement officers faced in solving Bowie's murder, as we previously have recognized, law enforcement activities in investigating a murder and attempting to apprehend the suspect may be relevant evidence under section 190.3, factor (a), to the extent that this evidence gives rise to

requested curative admonitions after the prosecutor's argument was completed. We will assume—without deciding—that these objections and requests were timely raised and therefore preserved these particular claims for appeal.

[39] Defendant also later objected on the same ground to an earlier comment by the prosecutor: that defendant should receive the death penalty "because of the quality of his life."

reasonable inferences concerning the circumstances of the crime and defendant's culpability. (See *People v. Edwards* (1991) 54 Cal.3d 787, 831–832 [1 Cal.Rptr.2d 696, 819 P.2d 436] [evidence of extensive manhunt after the murder that failed to apprehend the defendant was relevant to demonstrate defendant's planning and lack of remorse].) The prosecutor's argument in the present case reasonably could be construed as proper comment on defendant's choice to murder Bowie in a secluded location, where the murder likely would not be observed and discovery of her body likely would be delayed, and on his flight after the crime as evidence of planning and lack of remorse. The prosecutor's reference to a "typical" investigation did not appear to refer to anything more than a commonsense comparison that would be within the jurors' common knowledge, but even if this constituted an improper allusion to evidence outside the record, we discern no possibility of prejudice.

Defendant contends next that the prosecutor committed misconduct when he told the jury that pursuant to section 190.3, factor (a), the "[c]ircumstance of the crime you can consider as an aggravating factor, that is, the defendant was convicted and sits before you convicted of murder in the first degree, armed robbery, and violations of 211 of the Penal Code, auto theft in violation of VC 10851, with a special circumstance of murder committed during the course of a robbery found true." Defendant argues that this comment invited the jury to view the simple fact that defendant was convicted as an aggravating factor. This is not the objection he raised in the trial court, however. There, defendant argued (without much clarity) that the prosecutor's comment constituted improper dual use of an aggravating factor, specifically citing our decision on that subject in *People v. Clark, supra,* 3 Cal.4th 41, 168, where the prosecutor improperly urged the jury to consider the current offenses under section 190.3, factor (b). Defendant, therefore, has forfeited the particular claim he now raises on appeal. In any event, no misconduct appears. As to the trial objection, the prosecutor did not argue that the instant offenses could also be considered under factor (b); he, in fact, explicitly informed the jury that it could not make dual use of the circumstances of the instant crimes. As to the appellate claim, initially, we point out the statute provides that the jury "shall take into account . . . [¶] . . . the existence of any special circumstances found to be true." (§ 190.3, factor (a).) Moreover, as the prosecutor's next remark made clear, the reference to the circumstances of the crime concerned the *evidence* that led to defendant's conviction, not simply the fact of conviction: "So you can certainly take into consideration, and I'm not going to relitigate the first [phase] for you, but I am going to ask you that when you do deliberate you think back on the evidence and don't forget that evidence that we had in that [phase]." There was nothing improper about the prosecutor's remarks.

■ Defendant next contends that three portions of the prosecutor's arguments improperly attempted to exploit the jury's emotions regarding a

general fear of crime or sympathy for the victim's family. First, in arguing to the jury what weight it should give to Diana Bowie's testimony about the victim's background, the prosecutor argued that the circumstances of the crime were aggravating because this murder was unlike, for example, one occurring between drug dealers during a robbery, due to the fact that Jamie Bowie was an innocent bystander who was "just in the wrong place at the wrong time." The prosecutor went on to state, "Could be any of us, could be any of our children, it could be anybody that we know that doesn't deserve it. [¶] Scary. [¶] It's really scary what happens out there on our highways. And it's even more scary because we know we got a predator sitting right here in the courtroom with us. It is time that we take control of the situation and do what is right." Defendant argues that these comments "urge[d] the jury to personalize the killing and also, in effect, send a message to others." He raised no objection at trial to the prosecutor's statements and therefore has forfeited this challenge. Even had this claim been preserved, it is without merit because the randomness of the crime was a relevant consideration, and the prosecutor's comments, even to the extent that they referred to generalized fears aroused by random violence, were not unduly inflammatory. (*People v. Sanders* (1995) 11 Cal.4th 475, 551 [46 Cal.Rptr.2d 751, 905 P.2d 420] [" 'at the penalty phase . . . considerable leeway is given for emotional appeal so long as it relates to relevant considerations' "].)

Second, in describing Diana Bowie's reason for testifying, the prosecutor told the jury that she had decided to testify because, in her words, " 'The person that murdered Jamie had killed before and would kill again and I couldn't let this happen to someone else's child.' " The prosecutor continued, "Ladies and gentlemen, I encourage you to tell Mrs. Bowie, 'You're right. We thank you, Mrs. Bowie, and we're going to back it up, too. We're not going to allow this to happen again, and we will pursue it, and we will pursue it to the very end.' " Defendant contends on appeal that couching an argument regarding defendant's future dangerousness in the context of the victim's mother's fears was improper. Defendant did not object to these comments, and accordingly has forfeited his appellate challenge to them. In any event, as with the previous claim, there was no misconduct because the argument concerning future dangerousness, while perhaps appealing to the emotions of the jury, was relevant and not unduly inflammatory.

Third, in discussing the possibly mitigating effect of defendant's personal history, the prosecutor acknowledged defendant's "[r]ough, rough rearing," but argued, "I'm sorry. I'm sorry. Unfortunately, that doesn't do anything to help Mrs. Bowie. [¶] I'm sure that that is not much consolation or sola[ce] for Mrs. Bowie when she goes out and visits her daughter at the grave site. 'Jamie, he led a deprived childhood.' " Defendant later objected to the comments about helping Mrs. Bowie on the ground that it invited the jury to impose the death penalty in order to "make the victim's family feel better."

On appeal, defendant refines that argument somewhat, contending that the prosecutor's argument told the jury, through a "purely emotional appeal," that it could consider sympathy for the victim's family as an aggravating factor. Assuming this modified claim was preserved, we conclude it is without merit. Although phrased in an emotional manner, the prosecutor's comments permissibly contrasted the potential mitigating effect of defendant's past against the significant impact the murder had on Bowie's family. As the prosecutor pointed out in his following remark, "Lots of people lead deprived childhoods and they don't resort to these kinds of activities." The argument invoked the impact of the murder on the Bowie family, a relevant factor in the penalty determination, and was not an unduly inflammatory appeal to the jury's emotions.

Finally, defendant challenges the prosecutor's use during argument of a chart containing enlarged copies of 12 handwritten responses from jury questionnaires, in which then prospective jurors, some of whom were later seated on the jury, stated their views regarding the purpose served by the death penalty. Defendant objected—before arguments began—to use of the chart on essentially four grounds: (1) it constituted part of an improper argument to the jury concerning the general societal purposes for the death penalty, not argument specifically directed to the circumstances of defendant's case; (2) the chart improperly encouraged the jurors to place undue weight on their pretrial statements, rather than their view of the appropriateness of the death penalty after having heard the evidence presented at trial; (3) the chart's individual quotes improperly directed the argument to the juror who wrote that particular quote, rather than to the jury as a whole; and (4) use of the chart was cumulative, unnecessary and "extremely prejudicial." The trial court overruled the objection and allowed the prosecutor to use the chart with two limitations: (1) before discussing the contents of the chart, the prosecutor was to remind the jury that it is not helpful for the jurors to enter deliberations with preconceived notions about what verdict they should reach; and (2) the prosecutor would not identify during the argument who on the jury gave the responses included on the chart.

On appeal, defendant, citing our decision in *People v. Gurule* (2002) 28 Cal.4th 557, 657 [123 Cal.Rptr.2d 345, 51 P.3d 224] (*Gurule*), contends that the prosecutor's use of the chart was misconduct because it constituted an argument based upon facts not in evidence: namely, the jurors' questionnaire responses. Defendant did not object at trial to the use of the chart on this specific ground and therefore has forfeited such a claim on appeal. (*People v. Seaton* (2001) 26 Cal.4th 598, 679–680 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Medina* (1995) 11 Cal.4th 694, 744–745 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Moreover, defendant has not renewed on appeal the particular objections to the chart he did raise in the trial court, thus forfeiting those claims as well.

Nonetheless, even if defendant had not forfeited the various challenges he raised both on appeal and at trial, we would conclude that no reversible error occurred.[40]

Initially, we must observe that the prosecutor did not explicitly make an argument that was based upon facts not in evidence at the trial. Unlike in *Gurule*, the prosecutor never directly referred to voir dire or the fact that the chart consisted of responses taken from the jury questionnaires. (Cf. *Gurule, supra*, 28 Cal.4th at p. 657 [the prosecutor "asked the jury to reflect back to their responses on voir dire when they assured the court they could vote to impose the death penalty if the aggravating factors outweighed the mitigating ones"].) Thus, at least on the surface, the prosecutor's use of the chart and reading its contents aloud appears more akin to the reading of a quotation from a book or other source, which is generally a permissible tactic during argument to the jury. (See, e.g., *Vieira, supra*, 35 Cal.4th at p. 298 [quotation from Lord Denning]; *People v. Hines* (1997) 15 Cal.4th 997, 1063 [64 Cal.Rptr.2d 594, 938 P.2d 388] [passage from unidentified book].)

Similarly, in a strict sense, the prosecutor's use of the chart did not run afoul of our decision in *People v. Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249] (*Freeman*), in which we concluded it was improper for a prosecutor during argument to quote a juror's voir dire responses and identify the juror as the source of the statement. (*Id.* at p. 517 [after reading a quote to the jury, the prosecutor "then announced that the quote was not from an attorney or a judge, but from one of the 'prospective members of the panel' during the individual death-qualifying voir dire"; this "prospective" juror was actually a sitting juror].) The prosecutor here, as directed by the trial court, never explicitly told the jury that any of the answers in the chart were provided by any of the jurors.

Of course, the quotes at issue in the present case were not merely the words of an author or jurist, but were, in fact, the statements of some of the very jurors seated in the jury box. Moreover, the jurors' answers were presented in their own handwriting, enlarged and set out for all to see. Thus, the implications *behind* the use of the chart were quite different from merely presenting a quote from some person unrelated to the actual trial at hand.

---

[40] Although defendant characterizes his claim as one of prosecutorial misconduct, it is more appropriately viewed as a claim that the trial court abused its discretion in overruling defendant's objections and allowing the prosecutor to use the chart. "The trial court retains discretion to 'ensure that argument does not stray unduly from the mark.' [Citation.] Accordingly, the court's decision [to allow a certain argument] will not be disturbed on appeal absent an abuse of discretion.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1233 [17 Cal.Rptr.3d 532, 95 P.3d 811].) Regardless of whether we consider defendant's claim under the rubric of prosecutorial misconduct or trial court abuse of discretion, our analysis must focus on the propriety of the use of the chart.

That the chart offered facts not in evidence (some of the jurors' answers to the juror questionnaire) and quoted individual jurors in the argument to the entire jury would have been obvious, at a minimum, to those jurors whose answers were included in the chart. Accordingly, the use of the chart was improper under our decisions in *Gurule* and *Freeman*.

The prosecutor's use of the chart also could have created in the jurors' minds two more subtle implications that would have been improper. First, use of the jurors' own answers in their own handwriting possibly implied that if those jurors did not vote for the death penalty in defendant's case, they would be acting inconsistently with what they had written—under penalty of perjury—in their questionnaires. As we stated in *People v. Wash* (1993) 6 Cal.4th 215, 261 [24 Cal.Rptr.2d 421, 861 P.2d 1107], regarding the use of religious authority in argument to the jury, "[t]he primary vice in referring to the Bible and other religious authority is that such argument may 'diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.' [Citations.]" Here, the chart arguably might have, in a similar manner, pressured the jurors to conform their verdict not to biblical strictures, but to their earlier answers concerning the purposes served by the death penalty.

Second, because there were exactly 12 responses included in the chart, a juror who saw his or her own answer could have assumed that the remaining answers were those of the other jurors, and that the jury, therefore, was already unanimous regarding the efficacy of the death penalty. Such an assumption would have been akin to the jurors' having improperly discussed the case during the trial, before it had been submitted to them. In addition, an implication of preexisting unanimity based on the chart would have been misleading because all of the answers in the chart were not, in fact, from the 12 seated jurors.[41]

For these reasons, the use of the chart was improper.

Nonetheless, this impropriety was harmless under any standard. (See *Gurule, supra,* 28 Cal.4th at p. 657; *Freeman, supra,* 8 Cal.4th at p. 518.) The substance of the chart and the prosecutor's accompanying argument concerning justifications for the death penalty and the appropriateness of that sanction in the present case had some legitimate, probative value. (See

---

[41] Our review of the record discloses that the chart included the answers of seven of the seated jurors, two of the alternates, and three other responses, presumably from prospective jurors who did not serve. As to this last category, we note that the prosecutor was never asked to identify whose responses were included in the chart, and the parties on appeal do not offer any further information.

*People v. Zambrano, supra*, 41 Cal.4th at p. 1179 [it was not misconduct for prosecutor to "assert that the community, acting on behalf of those injured, has the right to express its values by imposing the severest punishment for the most aggravated crimes"].) The statements contained in the chart were not particularly inflammatory, but were essentially lay iterations of the legitimate purposes of deterrence, incapacitation and retribution. As the trial court directed, the prosecutor prefaced this portion of the argument with a reminder to the jurors that they should not begin deliberations with preconceived notions regarding the appropriate verdict, and, further, that "what you may have thought one day may change over the next day but we hope that whatever decisions you make are based on the evidence, the evidence that you've seen and heard throughout this trial." The trial court also later gave instructions to the jury, pursuant to CALJIC Nos. 17.40 and 17.41, reminding the jurors that during their deliberations they should not "hesitate to change an opinion if you are convinced it is wrong," nor begin deliberations with an "emphatic opinion" or a "determination to stand for a certain verdict." Moreover, as also directed by the trial court, the prosecutor's argument was framed as a general discussion of the purposes and appropriateness of the death penalty, using the statements in the chart to highlight these issues, and did not explicitly identify any particular answer as the previously expressed view of any particular juror, although, as noted, we acknowledge this circumstance would have been obvious to at least some of the jurors. Nonetheless, the prosecutor could have made a similar and proper argument without using a chart or the juror questionnaires. In addition, the prosecutor's argument, while potentially highlighting the agreement of some of the jurors with the general justifications for the death penalty, still properly left it for the jury to decide whether those purposes would be appropriately served by the imposition of the death penalty in defendant's case. That several of the jurors were presented with their own handwritten answers in conjunction with this otherwise permissible argument was not likely to have diminished any of the jurors' sense of responsibility, displaced the court's instructions regarding the jurors' duty to enter deliberations with open minds, or otherwise influenced the verdict.

 2. *Asserted Error in Instructing the Jury Pursuant to CALJIC No. 8.85*

Defendant contends the trial court's use of CALJIC No. 8.85 and a supplemental instruction concerning evidence of defendant's personal background in instructing the jury concerning the process by which it was to reach its penalty verdict violated his federal and state constitutional rights. Assuming, without deciding, that defendant may challenge these instructions even though they were given at his advisory counsel's request, his claims are without merit. As defendant acknowledges, we previously have rejected most of his general challenges to CALJIC No. 8.85: the trial court was not required

(1) to designate which sentencing factors are mitigating and which are aggravating (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]); (2) to instruct the jury that the absence of a mitigating factor may not be considered as an aggravating factor (*People v. Coddington* (2000) 23 Cal.4th 529, 639 [97 Cal.Rptr.2d 528, 2 P.3d 1081]); or (3) to instruct the jury that it could consider defendant's behavior during the trial as mitigating evidence, because the instruction regarding section 190.3, factor (k), "is adequate for informing the jury that it may take account of any extenuating circumstance" (*Vieira, supra,* 35 Cal.4th at p. 299; see *id.* at p. 300 ["It is generally the task of defense counsel in its closing argument, rather than the trial court in its instructions, to make clear to the jury which penalty phase evidence or circumstances should be considered extenuating under factor (k)."]). Defendant presents no compelling reasons to revisit these prior decisions.

In addition, the trial court was not required to instruct the jury that there is no burden of proof regarding mitigating factors. (*People v. Carpenter* (1997) 15 Cal.4th 312, 417–418 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*) [except as to other-crimes aggravating evidence under § 190.3, factors (b) & (c), "instructions associated with the usual fact-finding process—such as burden of proof—are not necessary"].) There is no reasonable likelihood the jury was confused by the fact that the instructions required proof beyond a reasonable doubt regarding the other-crimes evidence, but were silent regarding a burden of proof for mitigating evidence. Similarly, the trial court also was not required to instruct the jury that it need not be unanimous in finding the existence of any mitigating factor. (*People v. Breaux* (1991) 1 Cal.4th 281, 314–315 [3 Cal.Rptr.2d 81, 821 P.2d 585].) There is no reasonable likelihood the trial court's instruction requiring a unanimous *verdict* would confuse the jury regarding each juror's duty individually to evaluate and weigh the aggravating and mitigating evidence in arriving at a decision regarding the appropriate penalty. (*Ibid.*)

Finally, we reject defendant's claim that the supplemental instruction regarding the limited use of the evidence of defendant's personal background and life history, which was prepared by his advisory counsel and given over the prosecutor's objection, "compounded" the alleged error in not instructing the jury which factors could be considered in aggravation and which in mitigation.[42] Defendant argues on appeal that by singling out this one particular type of evidence, the jury could have improperly inferred that other types of potentially mitigating evidence not mentioned in the instruction, such

---

[42] The relevant portion of the special instruction provided that "[a]part from particular instances of violent criminal activity that the prosecution is seeking to prove or the fact (if there be any such fact) of the defendant's prior conviction of any felonies, you may not use any of the defendant's background or life history as an aggravating factor."

as his mental or emotional state or the actions of an accomplice, could be considered in aggravation, or that a finding of the absence of such mitigating evidence could be considered as an aggravating factor. We discern no reasonable likelihood that, as defendant argues, the jury would construe this supplemental instruction, which was clearly tailored to address a particular issue, as providing—by omission—guidance regarding how the jury should view other types of potentially mitigating evidence.

### 3. Challenges to the Constitutionality of California's Death Penalty Statute

Defendant reiterates various constitutional challenges to California's death penalty law that we have repeatedly rejected. Defendant provides no persuasive reason why we should reexamine our prior decisions.

"California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty . . . ." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229].)

Section 190.3, factor (a), which directs the jury to consider the "circumstances of the crime," is neither impermissibly vague nor overbroad, and it does not result in an arbitrary and capricious penalty determination. (*People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Stitely* (2005) 35 Cal.4th 514, 574 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Maury* (2003) 30 Cal.4th 342, 439 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

"The statute is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*Snow, supra*, 30 Cal.4th at p. 126.) Except regarding prior violent crimes and prior felony convictions under section 190.3, factors (b) and (c), the court need not instruct regarding a burden of proof, or instruct the jury that there is no burden of proof at the penalty phase. (*People v. Box* (2000) 23 Cal.4th 1153, 1216 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *Carpenter, supra*, 15 Cal.4th at pp. 417–418.) The decisions in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct.

2348] do not affect California's death penalty law. (*People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].) Moreover, " '[b]ecause the determination of penalty is essentially moral and normative [citation], and therefore different in kind from the determination of guilt,' the federal Constitution does not require the prosecution to bear the burden of proof or burden of persuasion at the penalty phase. [Citations.]" (*People v. Sapp* (2003) 31 Cal.4th 240, 317 [2 Cal.Rptr.3d 554, 73 P.3d 433] (*Sapp*).)

There is no requirement that the trial court or this court engage in intercase proportionality review when examining a death verdict. (*Sapp, supra,* 31 Cal.4th at p. 317.)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1287 [232 Cal.Rptr. 849, 729 P.2d 115].) Accordingly, the jury may consider unadjudicated offenses under section 190.3, factor (b), as aggravating factors without violating a defendant's rights to trial, confrontation, an impartial and unanimous jury, due process and a reliable penalty determination. (*Sapp, supra,* 31 Cal.4th at p. 316; *People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

" 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' [Citation.] Defendant's claim that the death penalty is imposed regularly as a form of punishment in this state 'is a variation on the familiar argument that California's death penalty law does not sufficiently narrow the class of death-eligible defendants to limit that class to the most serious offenders, a contention we have rejected in numerous decisions.' [Citations.]" (*People v. Carey* (2007) 41 Cal.4th 109, 135 [59 Cal.Rptr.3d 172, 158 P.3d 743].)

F. *Asserted Cumulative Error*

Defendant contends the cumulative effect of the asserted errors requires reversal of his conviction and sentence, even if none of the errors is prejudicial individually. We reject this claim. In those few instances in which we have found error or assumed the existence of error, we have concluded that any prejudice was minimal or nonexistent. In combination, these errors do not compel the conclusion that defendant was denied a fair trial, either.

### III. Conclusion

We affirm the judgment in its entirety.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 20, 2008.